

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00212-CV

_____

IN THE INTEREST OF M.R., A CHILD

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-107788-18

Before Sudderth, C.J.; Birdwell and Bassell, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

In three issues, Appellant Mother appeals the termination of her parental rights to her child, M.R. Because the evidence supports the trial court's findings in favor of termination, we affirm.

## Background

Mother has had seven biological children. The three oldest children were removed from Mother's care by a California agency and placed for adoption; they are now adults. Three more children were removed by the State of Texas, and Mother's parental rights were terminated for knowingly placing or allowing the children to remain in conditions or surroundings endangering their physical or emotional well-being and for engaging in conduct or knowingly placing the children with persons engaging in conduct which endangered the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). This case regards Mother's seventh child, M.R.

At the time that Mother gave birth to M.R. in July 2018, she was married to Husband, who is not M.R.'s biological father,[1] and Mother had been homeless for nine or ten months. The Department of Family and Protective Services (the Department) was referred to Mother and M.R. on the day of M.R.'s birth because of

---

[1]Mother identified the alleged biological father, but an attorney ad litem was unable to locate him. The trial court terminated the alleged father's parental rights in addition to Mother's. The termination of his parental rights is irrelevant to this appeal.

Mother's previous history with the Department. The Department removed M.R. from Mother's care on the day after M.R.'s birth.

## I. The Department's investigation

Morgan Overn investigated the case on behalf of the Department, and Sarah Vinet acted as Mother's Child Protective Services (CPS) caseworker. Both testified at trial, identifying several areas of concern regarding Mother's ability to care for M.R.: Mother's history of domestic violence, her troubling behavior around M.R., her mental-health issues, her illegal drug use, and her lack of a stable residence and employment.

### A. Mother's involvement with domestic violence

Overn testified to Mother's history of violence, of which Overn was familiar because she had investigated domestic-violence allegations during the Department's removal and termination proceedings regarding two of Mother's older children. According to Overn, Mother and Husband both acknowledged instances of domestic violence. Overn related Husband's description of two specific instances when Mother had assaulted him when he and Mother had been sleeping on the street because he did not want to cuddle with her. While Overn did not personally witness any physical abuse between Mother and Husband, Overn testified that "[t]here was a lot of yelling." For instance, Overn described a verbal altercation when Husband repeatedly told Mother to "shut up" when Mother was explaining to Overn that she "had to keep [M.R.] or she would not have a place in the shelter she was wanting to

go stay at." Overn testified that domestic violence is worrisome because it could result in physical and emotional harm to the children.

Vinet testified that she had discussed Mother's history of domestic violence with Mother, and although Vinet had requested that Mother participate in domestic-violence classes, Mother had refused.

In Mother's trial testimony, she denied any domestic violence had occurred between her and Husband or between her and the father of two of her other children. When Mother was confronted with her 2018 deposition testimony that her previous husband had assaulted her at least 22 times, she denied testifying that he had assaulted her. Instead, she claimed that they "had many accidents together" that involved blood and getting hurt but that he never punched or hit her. She described him as "the most loving, calm, nondrug using father that you would ever meet" and "a great father."

While most of the testimony on the topic of violence and criminal charges focused on Mother's involvement in domestic-violence incidents with her partners, Overn also testified to her review of CPS records that included a report of Mother's 2010 arrest after she physically blocked a caseworker's exit from a daycare parking lot.

**B. Mother's behavior around M.R.**

Overn described her first encounter with Mother and M.R. at the hospital shortly after M.R.'s birth:

4

When I first walked into the room [Mother] continued asking me and the nurse that was in the room to drug test the baby, and she kept trying to hand us the baby. When I explained that that's not something that I do and explained that the nurses already have done that, she continued trying to hand me the baby to the point where her arms were very far out over the bed and it was concerning to me that she was going to drop the baby so I did hold the baby and get the baby from her.

According to Overn and Vinet, after M.R. was removed and Mother's interactions with M.R. were limited to supervised visitation sessions, Mother made no progress in demonstrating her ability to be a safe parent. Overn described Mother's first visit with M.R.:

During the first visit, I had an observer helping me out watch that visit [between Mother and M.R.] while I was making some phone calls. She had let me know that she felt very uneasy about [Mother] holding the baby. She was not very steady. And so I was bringing the car seat to the visit room so we could have the baby sit in the car seat. As I was doing that, when I turned the corner to look into the room, [M.R.] was face down in [Mother]'s lap with her face in a blanket and so I went and picked up [M.R.] and I made a rule that [M.R.] had to sit in the car seat unless there was a worker standing right next to her while she was holding [M.R.]

A recurring theme from Overn's and Vinet's observations was Mother's preoccupation with her phone and her refusal to put the phone down during the visitation sessions. Overn testified that at one visit, two of Mother's other children[2] were also there, and Mother appeared "very uneasy, just appeared to not know how to hold [M.R.] and was constantly on her phone and [Mother] allowed [her eight-year-old

---

[2]At the time of the visit, Mother's rights to those two children had not yet been terminated. By the time of trial in this case, her rights to those children had been terminated.

5

child] to hold [M.R.] and [that child] was holding [M.R.] better than [Mother] was." Overn noted that Mother was constantly on her phone and "very easily distracted by stuff that was on her phone or taking pictures of something on her phone to where she would come close to or almost drop [M.R.]"

Vinet described another incident when Mother arrived at visitation wearing a neck brace and attempted to feed M.R. while holding the baby bottle with her chin and trying to use her phone at the same time. Vinet reported that the bottle fell out of M.R.'s mouth repeatedly, causing M.R. to scream, and Mother "would put the bottle back in her mouth while [M.R.] was screaming and she would choke on the formula." When Vinet asked Mother to put the phone down, explaining that "this was time she needed to spend with [M.R.]," Mother refused. After Vinet threatened to cancel the visit if she did not get off the phone, Mother complied by setting the phone on the table and putting it on speakerphone while she continued her telephone conversation about going to Whataburger for lunch afterwards. Vinet again warned Mother that if she did not hang up the phone, the visit would be ended, at which point, Mother "grabbed [M.R.], ran to the corner," and told Vinet she wanted to call police because Vinet and the other caseworkers were kidnapping her child. Vinet testified that Mother was holding M.R. so tightly that it took two security guards to pry M.R. free from Mother's arms.

The incident was reported to Overn, who testified that M.R. was three months old at the time and that Mother's tight squeeze had left "red marks on [M.R.'s] body."

6

According to Overn, M.R. was taken to the emergency room immediately after that visit, where it was confirmed that there were no broken bones or injuries resulting from the incident. Nor did the red marks leave any bruises on M.R.

Vinet testified that she was also concerned by other behavior Mother exhibited during visitations with M.R.:

> [W]hen [Mother] would be in the visit with [M.R.], if [M.R.] started to cry, she would just kind of zone out and she would twirl . . . her bangs and it's like she couldn't focus on [M.R.] or console her. She would be trying to feed [M.R.] She would take the bottle in and out of her mouth saying that she needed to learn to fight for her food. She would insist that [M.R] was only crying because she could smell the yeast in her breast milk and just couldn't console her. So we – during the visits we would have to take the baby from her, console the baby and as soon as she was consoled, give her back and then she would start screaming again and she would again zone out and I tried to get [Mother] to kind of come back to us and like read a book to her but she couldn't soothe her.

Additionally, Mother admitted at trial that "quite a few times" she attempted to sneak unrefrigerated, unfrozen breastmilk to M.R. during visitation appointments despite being prohibited from doing so due to food-safety concerns. At trial, Mother attempted to justify her action by explaining, "She was happy. She was smiling on her face."

In December 2018, after these two incidents when, by Vinet's estimation, Mother had put M.R. "in serious harm," the Department requested that supervised visits cease. The trial court granted the request. According to Vinet, Mother refused to speak to Vinet after that, referring to Vinet as an "enemy," and Mother did not try

7

to check in on M.R.'s health and well-being. Vinet opined that by the time of trial some six months later, Mother had no bond with M.R.

Mother disagreed and testified that she felt "very bonded" with M.R., and that M.R. is "part of [her] flesh." Mother professed that she wanted M.R. back because without M.R., she had a "very bad attitude" and was a "very rotten b**** . . . to deal with."

Mother defended her cell phone use during visits by explaining that she used her phone to take photos and videos of M.R. and to record incidents "where they would all come at me and panic me" during visitation. As to any phone conversations, Mother characterized them as "short phone calls."

### C. Mother's mental health

Trial testimony by Overn, Vinet, and Mother established that Mother had mental health issues, possibly caused by several head injuries she had sustained during her life. Mother testified that during her childhood, she was in a coma for six months after she was hit by a car, which resulted in significant damage to her brain. Mother also testified that when she was 18, she sustained another head injury when she fell out of a car traveling 75 miles an hour. She also described sustaining a head injury after being punched three times by a "drunk Indian." In addition, Mother reported a history of epileptic seizures and degenerative disk disease. Mother reported to Vinet that she had been prescribed seven different medications for her psychiatric issues—

which she obtained from various sources—and that she was taking all of them, but not as prescribed.

Overn characterized Mother as having "child-like qualities" and testified that Mother's "inconsistent behavior" led her to believe that Mother was either not taking her medications or not taking them regularly. Overn testified that when she visited Mother shortly after M.R.'s birth that Mother presented

> very similarly, if not slightly worse, to when [Overn] had seen her the year previously. It was very difficult for [Mother] to stay on topic and stay on track. She would answer questions that weren't asked or she would change the subject and start talking about something that was never a topic of conversation.

Overn related that she had observed Mother's behavior at a previous termination-of-parental-rights trial and described her testimony there as also "very off topic." According to Overn, Mother would "answer questions that weren't asked," answer questions she was instructed not to answer, and talk over people. Overn testified that as a result of Mother's behavior, the trial court judge ultimately held Mother in contempt and remanded her to the Tarrant County Jail.

Overn and Vinet noted that Mother did not have a consistent psychiatrist, and according to Vinet, Mother had not seen her previous psychiatrist in "several years." As a primary goal of Mother's service plan, Vinet attempted to address Mother's mental-health issues through proper psychiatric and primary-physician care. But Vinet testified that although Mother seemed to understand the plan's requirements "[t]o a degree," Mother would continually circle back to her desire to use M.R. as a

9

means to acquire housing. According to Vinet, Mother would complain, "If you would give me my child, I would have housing," and "If I had my child I would be living in a shelter and I would be able to eat." Based on these comments, Vinet had the impression that Mother viewed M.R. as a "means to an end" and wanted M.R. so that Mother could get housing.

Vinet also testified that Mother failed to grasp why M.R. had been removed and would continually claim, "[t]he only reason you removed my child was because [Husband] said that [another man] was the father."

Vinet referred Mother to free counseling services, but Mother was eventually unsuccessfully discharged because she either would not show up to counseling appointments or would show up late to appointments. Vinet reported that when Mother showed up late, she would behave in a disruptive manner by "stand[ing] at the door and ring[ing] the doorbell" and insisted on being seen, even after being told by the counselor that because she was 45 minutes late, the counselor was at that point meeting with other patients. Similarly, Vinet's review of Mother's medical records showed Mother had scheduled several appointments for behavioral care but that Mother had not followed through with them. Vinet attempted to take Mother to neurology appointments, as ordered by the court, but Mother would not provide Vinet advance information about the appointments: "I could never get her to respond to me on when they were and by the time I had gone out to see her home she said that she had already had that appointment."

10

Mother confirmed at trial that she had been prescribed several medications over the years, including Ritalin to help her focus. Mother initially testified that she was consistently taking her medication as prescribed, but she later testified that she could not always afford her medication and admitted that she had not been taking her Ritalin because she could not afford it. Vinet testified that Mother's failure to consistently take her psychiatric medications posed a risk to [M.R.] because psychiatric medicine has to be taken consistently in order to be effective in treating mental-health issues.

### D. Mother's illegal-drug use

Mother also had a history of using illegal drugs and tested positive for amphetamines, cocaine, benzodiazepines, and cannabinoids in November 2018. At trial Mother attributed the positive drug test to her smoking cigarettes handed to her while she was waiting to get housing in a shelter:

> I was still awaiting housing and when you're at the shelters and people are – you know, you'll never find me positive for crystal meth. You'll never find me for something that was done intentionally. Whatever was smoked in a cigarette was done because I was homeless awaiting my housing . . . .
>
> . . . .
>
> I would smoke anything that anyone handed me in a cigarette because you can't smoke meth in a cigarette but whatever was rolled up in a tobacco, I would smoke and excuse me. If it had anything in it, I didn't know.

### E. Mother's lack of a stable residence and employment

At the time of M.R.'s birth, Mother had been homeless for nine or ten months and was living in a shelter. Mother and Husband continued to be homeless during Overn's investigation, but they were living in an apartment by the time of trial. Vinet testified that the housing was appropriate, but the guardian ad litem testified that when he had visited the apartment, it was "a mess" with "a lot of things laying around that would be potentially dangerous for a child."

Mother testified at trial that she and Husband were unemployed but that she received monthly benefits as the result of a previous marriage and that Husband was in the process of applying for disability benefits.

## II. The trial court's findings

The trial court granted the termination on the grounds that Mother had knowingly placed or allowed M.R. to remain in conditions or surroundings which endangered M.R.'s physical or emotional well-being, had engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child, and had her parent-child relationship terminated with respect to two other children for those reasons. *See* Tex. Fam. Code Ann. § 161.001 (b)(1)(D), (E), (M). The trial court found termination was in M.R.'s best interest and correspondingly terminated Mother's parental rights.

12

## Discussion

Mother appeals the termination of her parental rights in three issues challenging the evidentiary sufficiency supporting the trial court's grounds for termination and best-interest finding.

## I. Standard of review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). For the same reason, we carefully scrutinize termination proceedings and strictly construe involuntary-termination statutes in the parent's favor. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 563; *Holick*, 685 S.W.2d at 20–21.

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy one ground listed in family code section 161.001(b)(1); and 2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear

13

and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that Mother

14

knowingly placed or allowed M.R. to remain in conditions or surroundings which endangered M.R.'s physical or emotional well-being or engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child, and that the termination of the parent–child relationship would be in the M.R.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## II. Grounds for termination

Mother's first two issues attack the evidentiary sufficiency supporting two of the trial court's grounds for termination: its findings that (1) Mother knowingly placed or allowed M.R. to remain in conditions or surroundings which endangered M.R.'s physical or emotional well-being and (2) Mother engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered M.R.'s physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

Mother does not challenge the third ground found by the trial court: that Mother's parental rights to another child had been terminated on Subsection (D) and (E) grounds. *See id.* § 161.001(b)(1)(M). Only one predicate ground is required to terminate parental rights if the trial court finds termination is in the child's best interest. *See id.* § 161.001(b). By failing to address the trial court's finding under

15

Subsection (M), Mother has waived her challenges to its Subsection (D) and (E) findings. *See In re Z.W.*, No. 02-18-00190-CV, 2018 WL 4354404, at *11 n. 11 (Tex. App.—Fort Worth Sept. 13, 2018, no pet.) (mem. op.). But out of an abundance of caution and in light of the supreme court's recent holding in *In re N.G.*, we will address Mother's arguments. *See In re N.G.*, 577 S.W.3d 230, 235, 237 (Tex. 2019) (requiring appellate courts to address Subsection (D) or (E) findings with detailed analysis out of concerns of due process and due course of law).

In the context of Subsections (D) and (E), "endanger" means to expose to loss or injury, to jeopardize. *In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). To terminate a parent's rights on the endangerment grounds of Subsections (D) and (E), it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Id.*

Repeated exposure to domestic violence, drug use, unstable living arrangements, inability to maintain employment, and difficulty providing necessities such as food and medical care are all factors that have supported endangerment findings under Subsections (D) and (E). *See id.*; *In re S.S.*, No. 02-18-00353-CV, 2019 WL 1715987, at *10 (Tex. App.—Fort Worth Apr. 18, 2019, pet. denied) (per curiam) (mem. op.) (considering, in upholding termination based on endangerment grounds, evidence that Mother engaged in violence in front of her children). In this case,

16

evidence was presented of Mother's propensity toward domestic violence, including her own assaults on Husband and allegations of a previous husband's assaults of Mother. *C.f. In re L.E.S.*, 471 S.W.3d 915, 923–24 (Tex. App.—Texarkana 2015, no pet.) ("A fact-finder can 'consider the history of abuse between the mother and the father for purposes of subsection (E), even if the children are not always present.'"). Mother tested positive for an array of drugs and, in acknowledging the positive test, blamed cigarettes given to her while waiting in line for the shelter. *See In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.) ("Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct."). Mother had a history of homelessness, and although she was living in an apartment by the time of trial, the guardian ad litem testified to its condition as "a mess" with "a lot of things laying around that would be potentially dangerous for a child." *See In re A.R.O.*, 556 S.W.3d 903, 911 (Tex. App.—El Paso 2018, no pet.) (considering mother's homelessness as evidence of conduct endangering her child's physical or emotional well-being); *In re T.T.F.*, 331 S.W.3d 461, 468 (Tex. App.—El Paso 2010, no pet.) (considering mother's past homelessness and the unclean and potentially dangerous nature of mother's current home as evidence relevant to a Subsection (E) endangerment determination).

In her brief, Mother argues that her "deficiencies" as a parent were a result of her head injuries, and therefore, she did not act knowingly or intentionally. Mental disability or illness alone is not a ground for terminating the parent-child relationship

17

under Section 161.001(b),[3] but it may be considered as a factor where the parent does not seek treatment or if the parent's mental state causes her to engage in conduct endangering the physical or emotional well-being of her children. *See In re P.H.*, 544 S.W.3d 850, 858 (Tex. App.—El Paso 2017, no pet.) (upholding termination where mother, due in some part to mental illness, neglected her children and failed to provide basic care for them); *In re R.S.-T.*, 522 S.W.3d 92, 114 (Tex. App.—San Antonio 2017, no pet.) (considering mother's mental illness in holding that trial court could have formed a firm belief that mother was unable to provide a stable life or safe environment for the child). Subsection (E) in particular does not include a "knowing" requirement; in other words, the parent need not know that her own conduct is dangerous. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *Carter v. Dallas Cty. Child Welfare Unit*, 532 S.W.2d 140, 142 (Tex. App.—Dallas 1975, no writ). And as a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). Much evidence was presented of Mother's inability or unwillingness to care for herself by actively managing her mental-health issues, despite offers of assistance from Vinet to transport her to

---

[3]Section 161.003 allows for the termination of a parent's rights if that parent has "a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child," and the parent's illness or deficiency will continue to render them unable to provide for the child's needs until the child's 18th birthday. Tex. Fam. Code Ann. § 161.003(a). The State did not plead this ground in its petition, and it is not at issue here.

appointments and set her up with a therapist, and evidence was presented of how her failure to do so resulted in conduct that endangered M.R. Additionally, the trial court heard testimony from Overn and Vinet of Mother's inability to properly handle and care for M.R. during supervised visitation sessions, despite Overn's and Vinet's efforts at guidance and assistance.

For these reasons, the evidence is both legally and factually sufficient to support the trial court's findings under Subsections (D) and (E). Accordingly, we overrule Mother's first and second issues.

## III. Best interest

Mother argues in her third issue that the evidence is legally and factually insufficient to support the trial court's finding that termination was in M.R.'s best interest. To determine whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a subsection (1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. In making our determination, we must employ a strong presumption that keeping a child with a parent serves the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We also consider the evidence in light of nonexclusive factors that the trier of fact may apply in determining the child's best interest:

    (A)    the child's desires;

    (B)    the child's emotional and physical needs, now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the child's best interest;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

M.R. was only eleven months old at the time of trial. Because of her infancy, the trial court could consider M.R.'s bond with her foster family in lieu of M.R.'s desires. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("When children are too young to express their desires, the fact finder may

20

consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent."). This is also relevant to factors of the Department's plans for M.R. and the stability of the proposed placement. Vinet testified that M.R. was doing "incredible" in her foster home and was bonded to her foster mother and father, who have been able to meet M.R.'s physical, emotional, medical, developmental, and financial needs. She described M.R. as "thriv[ing]" and having met developmental milestones. These factors weigh in favor of the finding of termination in M.R.'s best interest.

As we have discussed above, Mother's circumstances and behavior presented a risk of endangerment to M.R.'s emotional and physical needs and belied Mother's parenting abilities. Mother's involvement with domestic-violence incidents, drug use, and failure to maintain stable employment risked endangerment to M.R. Her behavior at supervised visitations, including her inability to properly hold, feed, or entertain M.R., displayed a lack of appropriate parenting skills. Mother argues in her brief that Vinet and Mother testified at trial that Mother had a safe and appropriate home for M.R., but the trial court also heard testimony from the guardian ad litem that the home was "a mess" and not safe for a child. It was within the trial court's discretion to weigh that evidence. *See J.O.A.*, 283 S.W.3d at 346. These factors weigh in favor of terminating Mother's parental rights.

As for programs available to assist Mother, Mother displayed an unwillingness to participate in and comply with such plans. Despite Vinet's prioritizing Mother's

21

medical and mental-health care as part of her service plan, Mother did not cooperate with Vinet and did not attend counseling or other medical appointments. A parent's noncompliance with a service plan may be considered as evidence in favor of termination in the child's best interest. *See In re A.B.*, 269 S.W.3d 120, 129 (Tex. App.—El Paso 2008, no pet.). This factor weighs in favor of termination.

For these reasons, the evidence is legally and factually sufficient to support the trial court's best-interest finding. We therefore overrule Mother's third issue.

### Conclusion

Having overruled Mother's three issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered:  December 5, 2019