

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00459-CV

_____


IN THE INTEREST OF M.K., A CHILD

---

On Appeal from the 211th District Court
Denton County, Texas
Trial Court No. 15-02179-211

---

Before Gabriel, Kerr, and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

After a bench trial, the trial court terminated Mother's and Charles's parental rights to their daughter, Mary.[1] Only Charles has appealed.

In Charles's first issue, he contends that the termination is improper because the Department of Family and Protective Services never proved his paternity. And in Charles's second through ninth issues, he asserts that the evidence is insufficient to prove the eight grounds on which the trial court relied to terminate his rights. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(B), (C), (D), (E), (F), (N), (O), (P).[2]

Because Charles's paternity had been determined in an earlier suit, we overrule his first issue. And because the evidence supports the trial court's (D) and (E) endangerment findings, we overrule Charles's second and third issues. Finally, because our rulings on Charles's first three issues make it unnecessary to dispose of his remaining issues, we deny them as moot. We affirm the trial court's judgment.

---

[1]We refer to the child, M.K., as Mary and to the father—because he disputes his paternity—as Charles. We refer to other family members by their relationship to Mary. *See* Tex. R. App. P. 9.8(b)(2) (requiring courts to use aliases to refer to minors in parental-rights-termination cases and—if needed to protect the minors' identities—to also use aliases when referring to family members); *see also* Tex. Fam. Code Ann. § 109.002(d).

[2]Charles does not challenge the trial court's finding that termination was in Mary's best interest. *See id.* § 161.001(b)(2).

**Paternity**

In his first issue, Charles contends that because the Department never established that he was Mary's father, the Department never established that he had any parental rights to terminate. We disagree.

## A. Background and summary

The Department brought two sequential termination proceedings against Charles.

In the first one, the trial court implicitly adjudicated Charles as Mary's father, awarded Charles possessory conservatorship, and ordered Charles to pay child support. In the current case, Charles relies on this order's failure to expressly adjudicate his paternity to support his argument.

In the second termination proceeding, precisely because Charles's paternity had already been resolved, the pleadings and evidence never questioned that issue, and the case proceeded with the implicit understanding that Charles was Mary's father. On appeal, Charles relies on the resulting absence of evidence squarely addressing his paternity to further support his contention.

Although Charles argues this issue in terms of evidentiary sufficiency, we disagree with his premise. The trial court determined Charles's paternity in the first proceeding, and Charles never appealed that order. By the time the Department filed the second suit, Charles's paternity was already res judicata.

**B.    Discussion**

In 2015, the Department filed a petition in which it identified Charles as Mary's "alleged father," asked to determine Charles's paternity, and sought to terminate his parental rights.[3] An "alleged father" is "a man who alleges himself to be, or is alleged to be, the genetic father or a possible genetic father of a child, but whose paternity has not been determined." *Id.* § 101.0015(a). When a proceeding to adjudicate a child's parentage is filed, "[t]he court shall render an order adjudicating whether a man alleged or claiming to be the father is the parent of the child." *See id.* § 160.636(a); *see also id.* § 160.601. Thus, one way or another, this first suit was going to resolve Charles's paternity.

DNA testing later corroborated that Charles was Mary's father.

After the DNA results, the parties entered an agreed order in late 2016 in which the court:

- awarded Mother managing conservatorship;

- awarded Charles possessory conservatorship;

- ordered Charles to pay Mother child support; and

- dismissed the Department as a party.

Within this 2016 order,

---

[3]The parental rights, if any, of even alleged fathers may be terminated. *See* Tex. Fam. Code Ann. §§ 160.404, 161.002; *In re D.T.*, No. 02-13-00331-CV, 2014 WL 261408, at *2–3 (Tex. App.—Fort Worth Jan. 23, 2014, no pet.) (mem. op.).

4

- when identifying the parties, Charles is initially referred to as Mary's "alleged father" (his appellation in the Department's petition) and thereafter as "Father";

- Charles is not identified merely as a "possessory conservator"; rather, he is identified as a "parent possessory conservator";

- the signature line for Charles's attorney initially provided, "Attorney for the Alleged Father [Charles]," but the word "Alleged" was crossed through so that Charles's attorney signed as "Attorney for the ~~Alleged~~ Father [Charles]"; and

- Charles signed the order over the signature line, "[Charles] Father of the Child [Mary]."

Although the agreed order does not expressly adjudicate Charles as Mary's father, it does so implicitly. Only "parents" pay child support. *See id.* § 154.001(a). A "parent" is "an individual who has established a parent-child relationship under Section 160.201." *Id.* § 160.102(11). And a "father-child relationship is established . . . by . . . an adjudication of the man's paternity." *Id.* § 160.201(b)(3). Whatever the order's arguable flaws, Charles agreed to pay child support, and by so agreeing, Charles was also agreeing that he was Mary's father. Given the DNA results, Charles had no basis to dispute his paternity in any event. Charles also acknowledged that he was conceding his paternity when both he and his attorney signed the agreed order above signature lines that expressly identified Charles as Mary's father.

When construing a judgment, courts should consider the record and the written instrument's entire content. *Point Lookout West, Inc. v. Whorton*, 742 S.W.2d 277, 278 (Tex. 1987) (per curiam). And courts should construe judgments as a whole to

harmonize and give effect to all portions. *Id.* Using these principles, we hold that the 2016 order established—that is, adjudicated—Charles as Mary's father. *See id.*

After the trial court signed this order, Charles never appealed it. Thereafter, neither the parties nor the court ever questioned Charles's paternity; it was treated as a given.

In late 2018, the Department filed a motion to modify under the same cause number as the first proceeding and again sought termination. This time, though, the Department identified Charles specifically as "[t]he father of the child [Mary]." And in this second proceeding, unlike in the first, the Department did not ask to adjudicate Charles's paternity.

Charles entered a general denial in which he identified himself as "Respondent Father." Charles also admitted being Mary's father in a July hearing that preceded the November 2019 trial.

Throughout the termination trial itself, Charles was identified as Mary's father. At one point, when asked why Mary's attorney had recommended suspending Charles's and Mother's visitation rights earlier in the case, a witness responded, "The recommendation was to suspend visits due to it[s] being traumatic for [Mary] to see the—her biological parents." And during trial, the 2016 order adjudicating Charles's paternity was among the exhibits admitted—without objection. Precisely because Charles's paternity had already been resolved in the first suit, paternity was not litigated in the second.

Even in his notice of appeal, Charles identified himself as "Respondent Father," yet he now seeks to relitigate his paternity.

We hold that by the time the Department filed its second termination petition, Charles's paternity was res judicata. *See Engelman Irrigation Dist. v. Shields Bros., Inc.*, 514 S.W.3d 746, 750 (Tex. 2017); *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). The time to dispute paternity had passed.

We overrule Charles's first issue.

## Grounds and Sufficient Evidence

In his remaining issues, Charles attacks the sufficiency of the evidence supporting the eight grounds for termination.

### A.     Standard of review

#### 1.     Generally

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

7

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001(b), .206(a); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds (currently up to 21) that are listed in Family Code Section 161.001(b)(1), and (2) termination is in the child's best interest under Section 161.001(b)(2). Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

Regarding Subsection 161.001(b)(1) grounds, the supreme court recently articulated an important qualification: if the trial court finds grounds under Subsection (b)(1)(D) or (E)—both of which involve endangering a child's physical or emotional well-being—an appellate court must review the (D) or (E) grounds on appeal because they have potential collateral consequences for other children the parent may have. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (providing that a prior termination under (D) or (E) is a ground for terminating parental rights to a different child); *In re N.G.*,

8

577 S.W.3d 230, 237 (Tex. 2019) (per curium) ("[I]f a court of appeals affirms the termination on either [(D) or (E)] grounds, it must provide the details of its analysis."). Termination may not be based solely on the child's best interest as determined by the factfinder under Section 161.001(b)(2). *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

### 2. Legal sufficiency

In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved both the particular ground for termination and that termination is in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam). We review all the evidence in the light most favorable to the finding and judgment, and we resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. We also must disregard all evidence that a reasonable factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we cannot weigh witness-credibility issues that depend on the witness's appearance and demeanor; that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573. And even when

credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

### 3. Factual sufficiency

We must perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support terminating a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In a factual-sufficiency review, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated an alleged ground and that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Grounds under (D) and (E)

### 1. Law

"Endanger" means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The parent's conduct need not be

directed at the child nor must the child actually suffer injury in order to be endangered within the statute's meaning. *J.T.G.*, 121 S.W.3d at 125.

Under (D), we examine evidence related to the child's environment to determine if that environment endangered the child's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(D); *J.T.G.*, 121 S.W.3d at 125. A parent's conduct in the home can create an environment endangering a child's physical and emotional well-being. *J.T.G.*, 121 S.W.3d at 125.

Under (E), we ask whether evidence exists that the parent had engaged in conduct or knowingly placed the child with someone who had engaged in conduct—including acts, omissions, or failures to act—that endangered the child's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(b)(1)(E); *J.T.G.*, 121 S.W.3d at 125. Additionally, (E) requires not just a single act or omission but rather a voluntary, deliberate, and conscious course of conduct. *J.T.G.*, 121 S.W.3d at 125.

We may conduct a consolidated review of (D) and (E) grounds when the evidence pertaining to both is interrelated, as it is here. *See In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g).

### 2. Evidence

The Department previously removed Mary in 2015 after she had tested positive for methamphetamines at birth. Mother had a history of drug use and had been homeless through much of her pregnancy. During the first case, both parents cooperated with the Department, and the court ordered Mary returned to Mother.

As for Charles, the order allowed him only supervised visits with Mary until he complied with drug testing. Charles never submitted to drug testing, but Mother let him have unsupervised visits anyway. The CASA[4] worker thought that Charles's having unsupervised visits under those circumstances endangered Mary's mental, emotional, or physical well-being.

Charles's unsupervised visits were not, however, what prompted the second suit. The Department initiated that removal in November 2018 after receiving a referral about Charles's and Mother's unstable housing and Mary's being exposed to drugs. The Department eventually located Mary at Grandmother's house. Mary again tested positive for methamphetamines.

At that time, Mary had been living with Aunt and Uncle at their home since October 2018; Grandmother would babysit Mary at Grandmother's house during the day while Aunt and Uncle were at work.[5] Aunt, Uncle, Grandmother, and Grandfather were Mary's caregivers at that time, and all four tested negative for drugs. Meanwhile, the Department could not contact—and thus could not drug test—either Charles or Mother.

---

[4]Court-appointed special advocate. *See In re J.P.-L.*, 592 S.W.3d 559, 571 n.16 (Tex. App.—Fort Worth 2019, pet. denied).

[5]Aunt explained that when Mary first came into her home, Aunt thought that the situation would be temporary because Charles and Mother had just been evicted, but Charles and Mother "never did get their lives together."

Nonetheless, the testimony at trial was that Mary's hair-follicle drug test could detect the presence of any drugs within a three-month time frame. The second removal and Mary's associated hair-follicle drug testing occurred in November 2018. Thus, Mary could have been exposed to the drugs detected in her hair-follicle drug test in August or September, while she was still in Charles's and Mother's care—and before Mary went into Aunt and Uncle's home in October 2018.

Other evidence tied Charles to methamphetamines. After the second removal, police incarcerated Charles twice in the Denton County Jail for possession of methamphetamines—once in December 2018 and once in April 2019—and a grand jury indicted him for state-jail felonies for both offenses. *See* Tex. Health & Safety Code Ann. § 481.115(a), (b).

And other evidence linked Mother to continued drug use, too. In May or June 2019, Mother gave birth to another child that tested positive for methamphetamines.

Neither Charles nor Mother appeared in Mary's case until after the Department had removed this other child. One witness opined that neither Charles nor Mother would have appeared in Mary's case at all but for the Department's removing Mary's sibling.

Charles's and Mother's appearing in Mary's case had consequences. In July 2019, the trial court suspended Charles's and Mother's visitations because both had admitted continuing and active drug use. The CASA worker agreed with suspending their visitation because neither parent had seen Mary in "a significant period of time"

and because neither had shown any commitment to getting Mary back, unlike they had in the first case. The trial court stated that visitation would resume only after each had submitted a clean urine test. But after that hearing, neither parent ever submitted a urine test at all.

By the time of trial in November 2019, neither Charles nor Mother had seen Mary in over a year. They had not even asked the CASA worker about their daughter. The CASA worker thought that both Charles and Mother were still using drugs and that both remained homeless. She noted that drugs and homelessness had caused Mary's removal in 2015 and that in November 2019, Charles and Mother were still struggling with both issues.

The Department's conservatorship worker stated that neither Charles nor Mother had initiated or participated in any services. Thus, she had no drug-test results for Charles.

Grandfather testified that Mother was unfit to parent because she had had a drug problem for about eight years and had struggled with homelessness for at least the past two years. He did not know where Mother currently lived, but he knew that she was still living with Charles. Grandfather thought that if Mary were returned to Charles and Mother, Mary would be endangered. From doctors' reports, Grandfather believed that Charles and Mother had already harmed Mary's emotional and physical well-being.

Aunt testified that when Mary first came into her home, Mary's behavior indicated that she had experienced trauma and loss. Mary wet her bed, had nightmares, and experienced night terrors. With time, Mary no longer exhibited those behaviors. Aunt also asserted that Mary's having tested positive for drugs was dangerous to Mary's physical, mental, and emotional well-being. According to Aunt, Charles and Mother never stopped using drugs and never found housing. Aunt said that after the second removal, Charles and Mother never offered any support and never sent Mary any cards, gift cards, clothes, shoes, or school supplies.

### 3. Discussion

#### a. Drugs

Charles used drugs. A parent's use of illegal drugs—and the drug's effect on his or her ability to parent—may qualify as endangering conduct. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Charles argues that there was no evidence at trial of a positive drug test for him. But that was because Charles had not submitted to drug testing. The court could have reasonably inferred that Charles avoided testing after the 2016 order and both before and after the second removal in 2018 because he was still using drugs. *See In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.).

#### b. Instability

Charles was homeless or, at the very least, lacked stable housing. *See In re A.R.O.*, 556 S.W.3d 903, 911 (Tex. App.—El Paso 2018, no pet.) (considering

15

mother's homelessness as evidence of conduct endangering her child's physical or emotional well-being). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

### c. Criminal conduct

While the case was pending, Charles had been arrested twice and was facing two indictments. Criminal conduct, convictions, and imprisonment are relevant when determining whether a parent has engaged in an endangering course of conduct. *In re S.R.*, 452 S.W.3d 351, 360–61 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533–34. If incarcerated, Charles would not be available to parent Mary; only Mother would be.

### d. Mother

And Charles remained with Mother, who, like Charles, used drugs. When Mother gave birth to Mary, Mary tested positive for methamphetamines, and when Mother gave birth to another child while Mary's case was pending, that child too tested positive for methamphetamines. *See M.R.J.M.*, 280 S.W.3d at 502–06 (concluding evidence was factually sufficient to support termination of father's rights under (D) and (E) when father allowed child to remain with mother despite knowledge of mother's past drug use).

16

### e. Indifference

After the Department removed Mary, Charles did not see her. He did not send her so much as a card. Not visiting a child endangers a child's emotional well-being. *See A.R.O.*, 556 S.W.3d at 911 ("[Mother] also endangered [her child's] emotional well-being by failing to regularly visit with her.").

### f. Mary tested positive

When the Department removed Mary, she tested positive for methamphetamines. Charles and Mother were the only persons who could have exposed Mary to the drugs given that (1) Mother permitted Charles unsupervised visitation with Mary despite his noncompliance with the 2016 order, (2) Mother later had another baby that tested positive for methamphetamines, (3) Charles was later arrested twice for possession of methamphetamines, and (4) Mary's other caregivers at the time of her removal in 2018 all tested negative with a hair-follicle drug test.

### g. Mary exhibited traumatized behavior

And when Mary came into Aunt's care, both Aunt and Grandfather believed that Mary's behavior suggested that she had experienced trauma while with Charles and Mother. Mary's attorney had recommended suspending Charles's and Mother's visitation rights because it was "traumatic for [Mary] to see . . . her biological parents." After Mary had been living with Aunt and Uncle and after Grandmother had been babysitting her, Mary's disconcerting behavior eventually stopped.

### h. Holding and ruling

We hold that the evidence suffices both legally and factually to support the findings that Charles

- knowingly placed or knowingly allowed Mary to remain in conditions or surroundings that endangered her physical or emotional well-being and

- engaged in conduct or knowingly placed Mary with persons who engaged in conduct that endangered Mary's physical or emotional well-being.

*See* Tex. Fam. Code Ann.§ 161.002(b)(1)(D), (E); *J.F.C.*, 96 S.W.3d at 265–66 (stating that to be legally sufficient, the evidence must be such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations); *C.H.*, 89 S.W.3d at 25 (stating that to be factually sufficient, on the entire record, a factfinder must be able to reasonably form a firm conviction or belief that the parent violated an alleged ground).

We overrule Charles's second and third issues attacking the legal and factual sufficiency of the trial court's (D) and (E) findings.

## C. Grounds under (B), (C), (F), (N), (O), and (P)

Having found the evidence legally and factually sufficient under (D) and (E), we need not address Charles's issues attacking the remaining grounds under (B), (C), (F), (N), (O), and (P). *See N.G.*, 577 S.W.3d at 237 n.1; *E.N.C.*, 384 S.W.3d at 803. We thus overrule as moot Charles's remaining evidentiary-sufficiency issues.

### Conclusion

Having overruled all of Charles's issues, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: April 23, 2020