COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| | § | No. 08-18-00025-CV |
| IN THE INTEREST OF A.R.O., | § | |
| | | Appeal from |
| A CHILD. | § | |
| | | 65th District Court |
| | § | |
| | | of El Paso County, Texas |
| | § | |
| | | (TC # 2016DCM2321) |
| | § | |

## **O P I N I O N**

This appeal is from a judgment terminating the parental rights of Appellant, C.O., to her daughter. We affirm.

## **FACTUAL SUMMARY**

Appellant and her four-year-old daughter, A.R.O. (hereinafter referred to by the fictitious name "Amber"), have lived in various homeless shelters in El Paso, and they have also lived with Appellant's boyfriend, C.E. (hereinafter referred to by the fictitious name "Charlie"). [1] In March 2016, Appellant left Amber at the Child Crisis Center because she was having financial difficulties and did not have a place where both of them could stay. On March 18, 2016, personnel at the Child Crisis Center filed a report with the Texas Department of Family and Protective Services

---

[1] To protect the identity of the minor child and for convenience, the opinion will refer to C.O. as Appellant and to A.R.O. by the fictitious name "Amber". *See* TEX.R.APP.P. 9.8(a), (b). The opinion will also refer to Appellant's boyfriend, C.E., by the fictitious name, "Charlie". The child's father is unknown.

(the Department) regarding their concerns about Amber. The report addressed two subjects: Appellant's failure to pick up Amber after ten days[2] and concerns about Charlie's behavior when he and Appellant visited Amber at the Child Crisis Center. It is the Child Crisis Center's policy to file a report if a child is not picked up within ten days. During the visits, Charlie appeared to be mentally unstable and intoxicated, and on one occasion, he admitted having narcotics in his possession. He also referred to himself as Appellant's "personal protection agent." Amber also appeared to be afraid of him.

The intake was assigned to Erika Montoya who is an investigator with the Department. Montoya attempted to speak with Amber about the allegations, but she responded to Montoya by just saying the names of different colors. Montoya also spoke with a therapist at the Child Crisis Center about Amber. On March 21, 2016, Montoya went to Charlie's apartment to interview Charlie and Appellant regarding the allegations in the intake report. Montoya saw bottles of alcohol in the kitchen. Montoya informed Appellant that Amber could remain at the Child Crisis Center only through that day and she needed to seek shelter for herself and Amber. Appellant told Montoya that she had been living at Charlie's apartment for a couple of weeks. She also told Montoya that she had left the battered women's shelter, La Posada, because she believed the program was not helping her. At trial, however, Appellant testified that she left La Posada because the facility had bed bugs. Appellant admitted to Montoya that she could not return to the Salvation Army because she failed to meet the program's requirements and was asked to leave. Montoya explained that the Salvation Army has a "chronically homeless program" which requires parents who are living there to actively seek employment, take care of their children, and apply for housing.

_____

[2] When the Child Crisis Center filed the report on Friday, March 18, 2016, Amber had been at the center for a "couple of weeks", and Appellant had been given an extension until Monday, March 21, 2016 to pick up Amber.

The Department worked with Appellant to find a shelter, but they were unsuccessful because Appellant either did not meet a shelter's requirements or she was not welcome to return due to past non-compliance with the shelter's programs. The Child Crisis Center was unwilling to grant Appellant any additional extensions. When Montoya asked what her plan was for Amber, Appellant stated that she wanted the Department to take temporary custody of Amber so she could get her life together and find employment.

Montoya explained to Appellant that this would constitute failure to take parental responsibility and Appellant stated she understood. The Department took emergency custody of the Amber on March 22, 2016. It subsequently filed a petition seeking to terminate Appellant's parental rights.

The case was assigned to the Department's caseworker, Amy Rivera, on March 23, 2016. The Department developed a service plan for Appellant, but Appellant did not attend the meeting scheduled for her to review the service plan with Rivera in April 2016. Rivera met with Appellant in May 2016 to discuss the service plan. The service plan required Appellant to complete psychological and psychiatric evaluations, OSAR assessment, to participate in individual counseling, parenting classes, and random drug screening, and to maintain housing and employment. Appellant completed the psychological evaluation and the OSAR drug and alcohol assessment. As a result of the OSAR assessment, Appellant was referred to Aliviane for outpatient treatment. She also completed the psychiatric evaluation, individual therapy, and parenting classes. Appellant did not, however, maintain employment or stable housing during the pendency of the case. She worked in temporary jobs, and at the time of trial, was working an average of twenty hours a week for two weeks each month although she had worked thirty-seven hours the week before trial. She sometimes worked as a food service substitute for the El Paso Independent

School District but was called only sporadically to fill in for an absent worker.

With regard to housing, Appellant had an apartment from November 2016 to about April 2017. In February 2017, the Department began working towards reuniting Appellant with Amber, and Rivera had a meeting with Appellant to explain what was expected. Rivera specifically told Appellant that Charlie could not be present during the visits. The Department scheduled the first unsupervised visit for Appellant and Amber on February 25, 2017, but Appellant missed the visit and she did not answer her telephone when Rivera attempted to contact her. Appellant later told Rivera that her phone's battery had died. Appellant had a visit with Amber the following day. Rivera went to the apartment and saw that there was food in the refrigerator and the utilities were working. The following week, Appellant had a second visit with Amber at the apartment, but there was no food and Amber told the caseworker that she was hungry. At a visit in early March, the caseworker observed that the apartment's electricity had been turned off, but the Department gave Appellant an opportunity to correct the issue before they canceled the visits. At the next visit, the foster parent reported that Appellant failed to return Amber to the designated drop off point in front of the apartment complex. Rivera went to the apartment complex and eventually found Appellant and Amber at a different apartment complex on the same street. Appellant explained that she had lost track of time and her phone's battery had died. The Department canceled the unsupervised visits because Appellant had not been providing food for Amber, the utilities in her apartment had not been turned back on, she was not abiding by the pick-up and drop-off times, and she had been allowing Charlie to be present during the visits.

In May 2017, Appellant was no longer living in the apartment and she told Rivera that she was living with a man she had met at Wal-Mart. Rivera went to the home and met the man, but she was unable to run a background check on him because she did not have the necessary

identifying information. Appellant began living at the Rescue Mission in July 2017 and she was living there at the time of trial on January 26, 2018, but Appellant had been given a termination notice from the Rescue Mission because she was not in compliance with its policies. Her final day at the Rescue Mission was January 31, 2018, just five days after the final hearing. Appellant believed the Rescue Mission would give her an extension, but George Sigales, a caseworker from the Rescue Mission, testified that Appellant would not be given any additional extensions because she had not applied for housing and had not saved 10% of her income as required by the Rescue Mission's policies. Appellant planned to call the Transitional Living Center but she had not yet done so. Appellant admitted that her ability to care for Amber had not changed since the case began. The Department filed a termination petition alleging that Appellant: (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child (Section 161.001 (b )( l )(D), Texas Family Code); (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child (Section 161.00l(b)(l)(E), Texas Family Code); (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child (Section 161.00l(b)(l)(O), Texas Family Code); and (4) used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and failed to complete a court-ordered substance abuse treatment program; or (ii) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance (Section 161.001(b)(1)(P), Texas Family Code). The

trial court found that the Department had proven the termination grounds under Section 161.001(b)(1)(D), (E), (O), and (P) by clear and convincing evidence, and that termination of Appellant's parental rights was in the child's best interest. The trial court appointed the Department as the permanent managing conservator of the child.

## TERMINATION GROUNDS AND BEST INTEREST
## UNDER SECTION 161.001

Appellant raises five issues challenging the legal and factual sufficiency of the evidence supporting the trial court's findings. In Issues One through Four, Appellant attacks the legal and factual sufficiency of the evidence supporting the four predicate termination grounds found by the trial court under Section 161.001(b)(1). In Issue Five, she challenges the legal and factual sufficiency of the evidence supporting the best interest finding made under Section 161.001(b)(2).

Parental rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code. *See* TEX.FAM.CODE ANN. § 161.001 (West Supp. 2017). Under this provision, the petitioner must (1) establish one or more of the statutory acts or omissions enumerated as grounds for termination, and (2) prove that termination is in the best interest of the children. *See id.* Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Texas Department of Human Services v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In the Interest of A.B.B.*, 482 S.W.3d 135, 138 (Tex.App.--El Paso 2015, pet. dism'd w.o.j.). Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We will affirm the termination order if the evidence is both legally and factually sufficient to support any alleged statutory ground the trial court relied upon in terminating the parental rights as well as the

finding of best interest. *J.S. v. Texas Department of Family and Protective Services*, 511 S.W.3d 145, 159 (Tex.App.--El Paso 2014, no pet.).

*Standards of Review*

When reviewing the legal sufficiency of the evidence in a termination case, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005), *quoting In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.O.A.,* 283 S.W.3d 336, 344 (Tex. 2009). We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *In the Interest of J.P.B.*, 180 S.W.3d at 573. We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, the inquiry is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the challenge findings. *See In re J.F.C.*, 96 S.W.3d at 266. We must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. A court of appeals should consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *Id*. If the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

*Section 161.001(b)(1)(E)*

In Issue Two, Appellant contends that the evidence is legally and factually insufficient to support termination of her parental rights under Section 161.001(b)(1)(E). If the evidence is legally and factually sufficient to support this termination ground, it is not necessary to address the sufficiency challenges raised in Issues One, Three, and Four.

The trial court found by clear and convincing evidence that Appellant engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangered the physical or emotional well-being of the child. The term "conduct," as used in Section 161.001(b)(1)(E), includes both the parent's actions and failures to act. *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex.App.--San Antonio 2000, pet. denied). To "endanger" means to expose the child to loss or injury or to jeopardize a child's emotional or physical health. *Boyd*, 727 S.W.2d at 533; *J.S. v. Texas Department of Family and Protective Services*, 511 S.W.3d at 159. Conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *See A.S. v. Texas Department of Family and Protective Services*, 394 S.W.3d 703, 712 (Tex.App.--El Paso 2012, no pet.); *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex.App.--Fort Worth 2009, no pet.). Neglect can be just as dangerous to the well-being of a child as direct physical abuse. *In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996). Endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, but it is not necessary that the conduct be directed at the child or that the child suffer injury. *Castaneda v. Texas Department of Protective and Regulatory Services*, 148 S.W.3d 509, 522 (Tex.App.--El Paso 2004, pet. denied).

Under Section 161.001(b)(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct,

including acts, omissions, or failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex.App.--Fort Worth 2003, no pet.). Termination under this subsection must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* When determining whether a parent has engaged in an endangering course of conduct, a fact finder may consider the parent's actions and inactions that occurred both before and after the child was born. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re B.C.S.*, 479 S.W.3d 918, 926 (Tex.App.--El Paso 2015, no pet.); *In re S.M.*, 389 S.W.3d 483, 491-92 (Tex. App.--El Paso 2012, no pet.).

Appellant's parental rights to her two older children were terminated in January 2011. The evidence in that case showed that Appellant left the children with intoxicated neighbors while she went drinking. Amber was born just a few months after the court signed the termination order. Appellant is consistently homeless and she sometimes spends the night with men she meets on the street or in stores. For example, Appellant met Charlie in 2014 when she was walking down the street. Appellant told Charlie she did not have a place to stay and asked him for help. Charlie invited them to stay at his home and they began a romantic relationship. In 2014, the Department investigated allegations that Charlie and Appellant had violent altercations and he had pointed a gun at her. The investigation was closed based on Appellant's representation that she and Amber had moved out of Charlie's home. Appellant continued this pattern of spending the night with strangers even during the pendency of this case.

Appellant and Amber have resided in shelters in El Paso, but Appellant is not welcome to return to them. Most recently, she was asked to leave the Rescue Mission because she failed to comply with its requirements of applying for housing and putting a portion of her income in savings. Since the case began, Appellant has been working temporary jobs and she lived in an

apartment for a few months, but the electricity was disconnected due to her failure to pay the bill. The caseworker provided Appellant with information about non-profit organizations that would help her pay the utility bills, but Appellant did not contact any of them. Appellant also had difficulty paying the rent and she sometimes did not have food for Amber during visits.

Appellant also endangered Amber's emotional well-being by failing to regularly visit with her. She attended only five out of twenty visits with Amber between April and May of 2017, and she did not visit or communicate with her for the next several months. Rivera observed that when she visited Appellant at the Rescue Mission, Appellant never asked her about Amber and did not seem motivated to be reunited with her. The record demonstrates that Appellant has Appellant has subjected Amber to a life of instability and uncertainty, and she has not provided for the child's basic needs. This conduct existed both before and after the case began. Despite being provided with services and assistance, Appellant has not taken advantage of the assistance or significantly altered her patterns of behavior. After reviewing the entire record, we conclude that the evidence is both legally and factually sufficient to establish a firm conviction in the mind of the trial court that Appellant engaged in conduct that endangered the physical or emotional well-being of the child. *See In re A.N.*, No. 02-14-00206-CV, 2014 WL 5791573 at \*18 (Tex.App.--Fort Worth 2014, no pet.)(father's continued homelessness and conduct of having the children sleep on pallets behind a bar and panhandle along a highway was evidence of endangering conduct by father). Issue Two is overruled. Consequently, it is unnecessary to address Issues One, Three, and Four.

*Best Interest - Legal Sufficiency*

In Issue Five, Appellant challenges the legal and factual sufficiency of the evidence supporting the best interest finding made under Section 161.001(b)(2) of the Family Code. A determination of best interest necessitates a focus on the child, not the parent. *See In the Interest*

*of B.C.S.*, 479 S.W.3d 918, 927 (Tex.App.--El Paso 2015, no pet.); *In the Interest of R.F.*, 115 S.W.3d 804, 812 (Tex.App.--Dallas 2003, no pet.). There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re B.C.S.*, 479 S.W.3d at 927. Several factors must be considered in our analysis of the best interest issue: the child's desires; the child's emotional and physical needs now and in the future; the emotional and physical danger to the child now and in the future; the parenting abilities of the individuals seeking custody; the programs available to assist those individuals to promote the child's best interest; the plans for the child by those individuals or the agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976)("the *Holley* factors"). We also must bear in mind that permanence is of paramount importance in considering a child's present and future needs. *In re B.C.S.*, 479 S.W.3d at 927.

We begin by examining the legal sufficiency of the evidence supporting the best interest finding. The first factor is the desires of the child. Amber was six years of age at the time of trial, and she indicated that she wishes to stay with her foster family and be adopted by them. This factor weighs in favor of the best interest finding.

The next two factors are the child's emotional and physical needs now and in the future, and the emotional and physical danger to the child now and in the future. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *Edwards v. Texas Department of Protective & Regulatory Services*, 946 S.W.2d 130, 138 (Tex.App.--El Paso 1997, no pet.), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002); *In re U.P.,* 105 S.W.3d 222, 230 (Tex.App.--Houston [14th Dist.] 2003, pet.

denied)(stating that children need permanency and security). A fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *In re D.L.N.*, 958 S.W.2d 934, 934 (Tex. App.--Waco 1997, pet. denied). As determined in our review of Issue Two, the evidence at trial established that Appellant engaged in conduct which endangered the physical and emotional well-being of the child. Psychologist Felix Carrion diagnosed Amber with attachment disorder and neglect. He testified that Amber's circumstances while living with Appellant caused her to experience a great deal of stress if not trauma. He recommended that she remain with her foster family and offered his opinion that being returned to Appellant could place Amber at great risk and have a devastating effect on her functioning. Based on the evidence, the trial court could have determined that the second and third factors weigh heavily in support of the best interest finding.

The fourth factor is the parenting abilities of the individuals seeking custody. In reviewing the parenting abilities of a parent, a fact finder can consider the parent's past neglect or past inability to meet the physical and emotional needs of the children. *D.O. v. Texas Department of Human Services*, 851 S.W.2d 351, 356 (Tex.App.--Austin 1993, no writ), *disapproved of on other grounds by In re J.F.C.,* 96 S.W.3d 256 (Tex. 2002). Even though Appellant successfully completed the parenting classes she was required to take, she continued to make poor decisions while the case was pending. The trial court could have determined that Appellant was unable to provide for Amber physically or meet her emotional needs both before the case began and while it was pending. This factor weighs heavily in favor of the best interest findings.

The fifth factor examines the programs available to assist those individuals to promote the child's best interest. Various programs were available to provide assistance to Appellant but she failed to take advantage of them. The trial court could infer from Appellant's failure to take the

initiative to utilize the available programs that she would not have the ability to motivate herself in the future. *In re W.E.C.*, 110 S.W.3d 231, 245 (Tex.App.--Fort Worth 2003, no pet.). This factor supports the court's best interest finding.

We will consider the sixth and seventh factors together. The sixth factor examines the plans for the child by those individuals or the agency seeking custody. The seventh factor is the stability of the home or proposed placement. The fact finder may compare the parent's and the Department's plans for the child and determine whether the plans and expectations of each party are realistic or weak and ill-defined. *D.O.*, 851 S.W.2d at 356. At trial, Appellant indicated that she needed additional time to address her employment and housing situation, and she indicated that her plan was to continue living in shelters. This demonstrates the same lack of planning and poor decision-making that caused Appellant to leave Amber at the Child Crisis Center in March 2016. As Appellant admitted, her circumstances had not changed since the case began. The trial court could have found after comparing these plans that the Department's plan is significantly more realistic than Appellant's ill-defined plan.

Amber is bonded with her foster family and refers to her foster parents as "mom" and "dad". Amber has improved significantly since she began living with the foster family in that she has become engaged and talkative and has improved at school. Further, she is engaged in extracurricular activities at school. The foster parents have expressed an interest in adopting Amber. The trial court could have found that allowing Amber to remain with her foster parents in a stable home is the far better plan and offers Amber permanency she would not have with Appellant. The sixth and seventh factors weigh in favor of the best interest finding.

The eighth factor is the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one. The evidence established that Appellant endangered

Amber's physical and emotional well-being by failing to provide a safe and stable home for Amber, moving in with strangers, moving from shelter to shelter, failing to take the steps that would lead to reunification, and failing to visit her. Based on this evidence, the trial court could have found that the existing parent-child relationship is not a proper one.

The ninth factor is whether there is any excuse for the parent's acts or omissions. Appellant's brief does not address this factor. This factor supports the best interest finding.

Having reviewed all of the *Holley* factors, we conclude that the evidence is both legally and factually sufficient to establish a firm conviction in the mind of the trial court that termination of Appellant's parental rights is in the child's best interest. Issue Five is overruled. The judgment terminating Appellant's parental rights to Amber is affirmed.

August 14, 2018

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.