

# NUMBER 13-20-00329-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF S.V. AND J.K.N. A/K/A K.V., CHILDREN

**On appeal from the County Court at Law
of Aransas County, Texas.**

# MEMORANDUM OPINION

**Before Justices Benavides, Longoria, and Tijerina
Memorandum Opinion by Justice Longoria**

The trial court terminated the parental rights of appellant M.V. (Mother) to her children S.V. and J.K.N. a/k/a K.V. (J.K.N.).[1] By two issues, Mother argues that (1) the evidence was insufficient to support the trial court's judgment terminating her parental rights under any of the four statutory grounds found by the trial court and (2) terminating

---

[1] To protect the identity of the children, we refer to those involved in the case by aliases, as necessary. *See* TEX. R. APP. P. 9.8(b).

her parental rights was not in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O), (2). We affirm.

## I.  BACKGROUND

Mother and P.V.[2] are the parents of S.V., who was twelve years old at the time of trial; Mother and J.N. are the parents of J.K.N., who was six years old at the time of trial. On June 11, 2019, the Texas Department of Family and Protective Services (the Department) filed a petition for conservatorship of S.V. and J.K.N. and for termination of Mother's parental rights. Attached to the Department's petition was the affidavit of Brooke Tucker, a specialist with the Department, who averred that she received an intake call on June 9, 2019, that there was an incident of domestic violence between Mother and her then boyfriend, C.S., in the presence of J.K.N. Upon her attempt to investigate, Tucker made contact at the residence, however, there was no answer by Mother. The residence

> was observed with the front door open, various objects were observed inside the home. The porch had clothing and other debris scattered around. The bottom two windows in the front door were observed broken out. The window to the right of the front door was completely broken out with glass debris inside the window and outside of the window on the front porch and on the steps leading to the front porch. There was a car in the front yard observed with multiple smash marks to the front windshield, and dings all over the hood and roof of the vehicle. The driver's side door to the car was wide open, the back window to the car was completely broken out with glass observed inside and outside of the vehicle. There were various clothing, wood materials, etc. observed dispersed all throughout the front yard to the trailer. The trailer, and trailer park do not have running water or electricity due to being cut off for safety concerns of the trailer park.

Tucker's narrative further explained that while she was investigating the situation, she spoke with J.K.N., who was with a neighbor at the time, and he informed her that he had

---

[2] P.V. voluntarily relinquished his parental rights, and the trial court entered an order terminating his parental rights as to S.V. P.V. is not a party in this appeal.

witnessed violence between Mother and C.S., as well as destruction of the property by both.

Mother returned to the trailer park while Tucker was present and stated that she intended to take both of her children away to Hawaii. Mother refused an oral drug swab and Tucker believed Mother was under the influence of an illegal substance. Mother informed Tucker that her daughter, S.V., was in the care of relatives and that S.V. "was living with her in Aransas Pass off and on." Tucker did not believe either child would be safe with Mother. Tucker indicated that S.V.'s current caretakers, Mother's sister and her sister's husband, L.A. and K.A., were willing to accept both children in their home.

Tucker also detailed Mother's history with the Department, which began in March 2010, when the Department received a referral alleging physical neglect and neglectful supervision of S.V., which included allegations that Mother was engaging in drug use in front of two-year-old S.V. The Department found the allegations of "Physical Neglect and Neglectful Supervision were Unable To Complete." The Department received five additional similar reports of neglect between March 2010 and October 2018. Tucker believed "there [was] an imminent and/or immediate danger to the physical health or safety of the children [S.V.] and [J.K.N.] and that there is no time, consistent with the physical health or safety for the child, for an adversary hearing." The children were placed with L.A. and K.A.

## A.    Status Hearing

At an adversary hearing on June 21, 2019, the Department was appointed as temporary managing conservator of the children. A service plan with a goal of family

3

reunification was developed on July 10, 2019. On July 25, 2019, the trial court held a status hearing. Stephanie Ortega, the Department's caseworker, testified that both children were with L.A. and K.A., who are related to the children, and that J.K.N. was having some behavioral issues that may affect his placement with the relatives. Ortega testified that J.N. was willing to care for both children in Hawaii, but that S.V. did not want to leave her current placement. Ortega further testified that Mother had a drug test on June 25 which resulted in a negative urinalysis and a positive hair follicle; however, the hair follicle level was decreasing which indicated that Mother had not used drugs since her initial drug test. Mother was still in a relationship with C.S., and the two were living together.

Mother testified regarding her living situation when the children were removed, explaining that while the home did not have electricity or running water, the children were not staying in the home with her. She explained that J.K.N. would sleep at a neighbor's home and that S.V. was staying with L.A. and K.A. She also denied that she and C.S. were in a violent relationship and denied that there were numerous police call outs to the home for domestic abuse.

J.N. testified that Mother was a good mother, though she was aggressive; when he and Mother were in a relationship, he described it as "volatile." He left Texas to move to Hawaii where he works full-time and resides with his mother. J.N. also agreed that he was willing and able to accept custody of S.V. and J.K.N., though S.V. is not his biological daughter, as long as it was "what's best for the kids." He testified that he believed the siblings had a good bond, and it would be hard to separate them.

4

K.A., Mother's brother-in-law and one of the caretakers of the children, testified that S.V. had lived with him and his wife, L.A., prior to the Department removing the children. Having S.V. with them has "been a dream." He explained that the transition was "hard" for J.K.N. and that J.K.N. is displaying behavioral issues. K.A. testified that he and his wife wanted S.V. to stay with them, but that he believed J.K.N. would do better in another placement, potentially with J.N., as it would be more suitable to J.K.N.'s needs and could provide him additional attention and support.

At the conclusion of the July 25 hearing, the trial court found that Mother reviewed, understood, and signed the service plan and that both children would remain in the care of L.A. and K.A.

## B. Permanency Hearings

The trial court held an initial permanency hearing on September 26, 2019. Ortega testified that the children were doing well in their placement with K.A. and L.A., and that J.K.N.'s behavior had improved. She stated that the process of approving J.N.'s home in Hawaii as placement for J.K.N. was underway and that the results were to be expedited. Regarding Mother's progress on her family service plan, Ortega testified that Mother initiated her services with counseling and that she had received reports that Mother "appears to be very motivated to complete services." Mother had reported for several drug tests with her hair follicle still showing positive but with declining amounts, "indicat[ing] that she's not been using." Mother had informed Ortega that she owned her own tree cutting business, but Ortega had not been able to confirm Mother's employment. Ortega further testified that Mother's housing situation was not ideal as she and C.S. were

5

currently living in a rundown home, facing eviction for failure to pay rent.

Visitation between Mother and the children was scheduled weekly for one hour, and, according to Ortega, Mother missed some of the visits. Based on the visits Mother attended, Ortega testified that she believed there needed to be more engagement from Mother. Ultimately, Ortega testified that Mother was showing significant progress early in the case, and the Department was seeking reunification at the completion of the case. Ortega stated that the Department would like Mother to continue her services, provide documentation that she was attending her services, obtain stable housing, and participate in family counseling when it is deemed acceptable. She also wanted to see a negative hair follicle drug test from Mother.

Mother testified that she had been working on her services and intended to continue her service plan through completion. She expressed that during some visits with the children S.V. has expressed some anger with her but that she knows it is a difficult situation. Mother did not deny she was having issues with maintaining stable housing but indicated that she intended to move and get a larger trailer home.

The trial court ordered that the Department would remain as temporary managing conservator, placement with K.A. and L.A. would remain, and added an extra hour of weekly visitation between Mother and the children.

On December 10, 2019, the trial court held a permanency hearing before final order and heard testimony from Ortega, Mother, and K.A. Ortega testified that Mother has continued with some of her counseling services, though Ortega had not received progress notes for November 2019. Mother was not compliant with her drug testing, having missed

6

several scheduled tests. Further, Ortega testified that she was unable to visit Mother's current residence as Mother has not been forthcoming about her home, nor has she been very communicative about her service plan. Ortega believed, at the time of the hearing, that Mother was living in San Antonio, so Ortega informed her she would need to be assigned a worker from the Department in San Antonio to continue her service plan, and Mother indicated she did not want to restart services and would return to Rockport.

Ortega also stated that Mother had been missing visitation with the children because of her work schedule and being in San Antonio. Ortega explained that she had not received any progress notes or certificates of completion of any of Mother's required counseling or services. Ortega was questioned regarding each task on Mother's service plan which indicated Mother's non-compliance in nearly every task. Ortega explained that the process of approving J.N. as an option for placement was still in the works, being that he was in Hawaii, things were taking a bit longer.

Mother testified that she was working and attending her services as required under her treatment plan. She indicated she did miss some visits with the children due to her work schedule. She also missed some drug testing due to being in San Antonio for work and inconsistent communication with Ortega. She still had a goal of buying a larger trailer home for her family but had been unable to do so thus far.

K.A. testified that the children remained in his and his wife's care and that both children were doing well. According to K.A., S.V. was excelling and very happy with her placement with K.A. and L.A., and J.K.N. was improving, though he did still have behavioral issues. K.A. believed S.V. wanted to remain where she was.

7

The trial court ordered that the Department remain as temporary managing conservator, the children remain in the care of K.A. and L.A., and Mother was required to drug test that day.

On March 10, 2020, a permanency hearing was held. Ortega testified that J.N.'s home study had been completed, and he was approved for placement pending a signature of approval from the regional director of the Department. While Ortega previously testified that Mother was making efforts in her service plan, she indicated at the March 10 hearing that Mother had not been cooperative with the Department. Ortega stated that Mother's last known residence was not fit for the children as the trailer home had a lot of damage to it and debris in and around the home that would create safety concerns if the children were to live there. Ortega described Mother's visitation with the children as "sporadic," but stated that when she does attend, she is "very engaged." Mother was not compliant with drug testing; Ortega stated that the last hair follicle result she had for Mother was from October and the last urinalysis she had was from December. At the December drug test, Mother refused to do a hair follicle test, stating that her head had been burned and it was too traumatic for her to remove her hat. Ortega spoke to the technician, who informed her that Mother had viable neck hairs, but she refused to let the technician test them.

Ortega explained that Mother had initially started all of her services when the family plan was initiated, but according to Ortega, Mother's participation dropped off or stopped in October. Mother reinitiated services in February just prior to the March 10 hearing. The Department had not received any indication or progress notes to confirm that Mother had

8

continued with her counseling or service plan programs. Due to Mother's non-compliance with her service plan, the Department recommended K.A. and L.A. be able to adopt S.V., or at least have permanency in their home, and that J.K.N. be placed with his father, J.N., once approved. Ortega testified that S.V. relayed to her that she wished to stay with K.A. and L.A. but did not want to lose visitation with Mother. The Department was seeking permanency so that Mother could not attempt to take the children back at some point in the future. At the hearing, the Department asked the trial court to maintain the current status quo and to set a trial date for termination of Mother's rights.

Mother testified that she still has "every intention to finish" her service plan before the termination hearing; she believes she is on the right path and that it is a "journey" for her; she stated that she could provide sign-in sheets and proof that she was still attending services. When asked about her drug testing, she disagreed with Ortega and stated that she had been to more recent drug tests, and she could also provide documentation for that. She explained that at the December drug test, her scalp was badly burned, and she did not believe there was any viable hair for the technician to take because she had shaved her head. Mother asked that her rights not be terminated, that she be allowed to finish her services, and continue visiting her children.

## C.     Termination Proceedings

On June 3, 2020, the trial court heard testimony from Ortega that the home study on J.N. had been approved with no concerns about placement of J.K.N. in Hawaii with his father. The Department was seeking to have J.K.N.'s care be transferred to his father as soon as possible. J.N. consistently maintained contact with the Department and was

9

ready and able to take custody of his son. The Department ensured that if J.K.N. were transferred to Hawaii, the Department would maintain contact to ensure the placement was appropriate. J.N. testified that he was ready to have his son with him in Hawaii and that he was able to provide a safe and secure home for him. J.N. was agreeable to supervised visits with Mother, though he testified about some harassing calls and emails he had received from her during the pendency of the case.

The trial court found that it was in the best interest of J.K.N. to be transferred to live with J.N. He further ordered that there may be visitation with Mother through "a third-party by personal visitation or by telephone." The matter was recessed pending jurisdictional matters and recalled on July 21, 2020.[3]

On July 21, 2020, the termination trial proceeded. Mother appeared by phone from a rehabilitation facility in Corpus Christi. Ortega testified that S.V. was still with K.A. and L.A., and that J.K.N. was with J.N. in Hawaii, and that both children were doing well. The Department recommended termination as Mother had not provided a stable home suitable for the children, frequently skipped her drug tests, and was not in compliance with her service plan. Ortega also reiterated her concerns from the final permanency hearing, including that Mother missed more than half of the scheduled visitations with the children, failed to maintain contact with the Department, did not have stable or suitable housing or proven employment, was a known aggressor in her relationship with C.S. but

---

[3] On June 3, 2020, the termination proceedings began in the trial court; however, it was brought to the trial court's attention that there may be an issue with jurisdiction over S.V., as there had been a previous divorce order that affected S.V. as an unnamed party in another court. Given the circumstances, the trial court opted to hear evidence regarding the placement of J.K.N. and to reconvene the matter on July 21, 2020.

did not seek the appropriate counseling services, did not attend her personal counseling services, including drug treatment, and did not pay child support as ordered. Because Mother did not "complete any task on her service plan" during the pendency of the case, the Department recommended termination of her parental rights. Ortega did not dispute that at the beginning of the case, Mother began her services immediately and seemed motivated to complete her service plan. However, Mother's attitude seemingly changed during the pendency of the case, and despite several opportunities to correct her course, Mother did not complete any task in the allotted time to do so.

Based on her conversations with S.V., Ortega testified that S.V. wanted to remain in the care of K.A. and L.A. but would like the option of visitation with Mother. Ortega stated that even with termination, the visitation can continue should Mother demonstrate to the caretakers that she is sober and able to maintain a stable home environment, but that termination is the only avenue to provide S.V. with a permanent place with K.A. and L.A. and J.K.N. with J.N.

L.A. testified that she and her husband K.A. are the caretakers for S.V. and that S.V. is thriving in their care. L.A. took S.V. in prior to the children's removal from Mother when L.A. wanted to remain in the Port Aransas school district and Mother was moving to Rockport. L.A. confirmed that if visitation was appropriate in the future, she would not restrict S.V. from seeing Mother. K.A. similarly testified and also expressed the desire to adopt S.V.

Mother testified that she was currently in inpatient rehabilitation and intended to stay there as long as she could to get the help she needed. She expressed that she did

miss drug tests but passed all the tests she did take. She also said that some of the information presented by the Department was false but did not elaborate. Mother was hoping to complete her rehabilitation, and that with some time, she stated that she can get on her feet and get to where she needs to be, as she was still trying to complete her plan. She admitted that she was not prepared to take her children back at the time of the trial but indicated that she did not want her rights terminated.

The trial court found that it was in the best interests of the children to terminate the parent-child relationship with Mother. The trial court further found that Mother allowed the children to "remain in a dangerous situation, in a home that involved drug use, illegal drug use, domestic violence" and Mother was unable to provide a stable, safe, and secure home for the children. The trial court indicated that Mother's failure to pay child support and failure to complete drug and domestic violence counseling and treatment were some of the specific examples of Mother's failure to comply with her court ordered service plan. Mother brought this appeal challenging the trial court's determinations.

## II.    DISCUSSION

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.); *see Stantosky v. Kramer*, 455 U.S. 745, 753 (1982). "Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases." *In re K.M.L.*, 443 S.W.3d

12

101, 121 (Tex. 2014) (Lehrmann, J., concurring). Accordingly, termination proceedings must be strictly scrutinized. *Id.* at 112. In such cases, due process requires application of the "clear and convincing" standard of proof. *Id.* (citing *Stantosky*, 455 U.S. at 769; *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). This intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the beyond a reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. "'Clear and convincing evidence' means a 'measure of degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam) (quoting TEX. FAM. CODE ANN. § 101.007); *see In re K.M.L.*, 443 S.W.3d at 112–13 ("In cases requiring clear and convincing evidence, even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true."). "When reviewing a finding made by clear and convincing evidence, we determine whether the evidence is sufficient to make the existence of a fact highly probable, not whether the evidence supporting the finding is sufficient to make the existence of the fact more probable than not, as in ordinary civil cases." *In re D.M.*, 58 S.W.3d 801, 808 (Tex. App.—Fort Worth 2001, no pet.).

The trial court may order the termination of the parent-child relationship if the court finds by clear and convincing evidence that: (1) the parent committed an act or omission described in family code subsection 161.001(b)(1) and (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b); *In re N.G.*, 577 S.W.3d at 232.

"To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d at 232; *see* TEX. FAM. CODE ANN. § 161.001(b). However, we must always review any sufficiency challenge on appeal to a termination under subsection (D) and (E). *In re N.G.*, 577 S.W.3d at 235 ("When a parent has presented the issue on appeal, an appellate court that denies review of a section 161.001(b)(1)(D) or (E) finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children.").

In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but it must otherwise assume the factfinder resolved disputed facts in favor of the finding. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true. *Id.* at 631.

In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.* Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.*

14

## A.     Termination under § 161.001(b)(1)(D)—Endangering Environment

By her first issue, Mother argues that there was legally and factually insufficient evidence to support the termination of her parental rights under § 161.001(b)(1)(D).

A parent's rights to his or her child may be terminated if the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). "Endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *In re V.A.*, 589 S.W.3d 317, 328 (Tex. App.—Houston [14th Dist.] 2020, no pet. h.); *see In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). "Knowingly" requires that "the parent be aware of but disregard" the potentially endangering environment at issue. *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Endangerment under subsection (D) focuses on evidence related to the child's environment. *In re V.A.*, 598 S.W.3d at 328; *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed. *In re I.D.G.*, 579 S.W.3d 842, 850 (Tex. App.—El Paso 2019, pet. denied); *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi–Edinburg 1993, no writ). It is not necessary, however, that the Department show the child's environment directly threatened or injured the child. *See In re M.M.*, 584 S.W.3d 885, 889 (Tex. App.—Amarillo 2019, pet. denied). Further, termination under subsection (D) may be based on a single act or omission. *See id.* at 889–90; *In re J.E.M.M.*, 532 S.W.3d 874, 884 (Tex.

15

App.—Houston [14th Dist.] 2017, no pet.); *In re E.M.*, 494 S.W.3d 209, 221–22 (Tex. App.—Waco 2015, pet. denied); *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied); *see also In re L.S.*, No. 13-18-00632-CV, 2019 WL 1474521, at *7 (Tex. App.—Corpus Christi–Edinburg Apr. 4, 2019, pet. denied) (mem. op.).

The acceptability of living conditions and parental conduct in the home are subsumed in the endangerment analysis. *In re V.A.*, 598 S.W.3d at 328; *In re J.E.M.M.*, 532 S.W.3d at 880–81; *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Likewise, "inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home" under subsection (D). *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.).

### 1. Drug Use

A parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). The Department presented evidence that Mother engaged in illegal drug use before and during the pendency of the case. Mother's first hair follicle drug test was positive for methamphetamines and although subsequent tests revealed decreasing values, indicating she discontinued use, Mother skipped and refused several drug tests required by her service plan, which the Department considers positive test results. Because Mother consistently evaded drug testing after the children's removal, it was impossible to

16

determine whether she maintained any prolonged period of sobriety.

### 2.    Domestic Violence

Physical violence in the home leads to an unstable and unpredictable environment for children. *In re O.E.R.*, 573 S.W.3d 896, 905 (Tex. App.—El Paso 2019, no pet.) (citing *In re U.H.R.*, No. 07-18-00318-CV, 2019 WL 81874, at *5 (Tex. App.—Amarillo Jan. 2, 2019, no pet.) (mem. op.)). The Department presented evidence that police were called to the home numerous times to respond to domestic violence situations between Mother and C.S. Further, J.N. testified that during his relationship with Mother, she was hostile and volatile at times. J.K.N. told his caregivers that he witnessed violence between his Mother and C.S.

### 3.    Housing

When seeking termination under subsection (D), the Department must show that the children's living conditions pose a real threat of injury or harm. *Id*. At the time of children's removal, Mother was living in a trailer home without electricity or running water. At the time of removal, S.V. was residing with K.A. and L.A., and Mother stated that J.K.N. often slept at a neighbor's home as Mother's home was not suitable for the children. The Department also provided evidence of the hazards posed by the conditions of the trailer home including broken windows, scattered debris, and damaged property and vehicles surrounding the home. *See In re A.L.*, 545 S.W.3d 138, 146–47 (Tex. App.—El Paso 2017, no pet.) (noting clutter in home when determining evidence sufficient to support finding parent placed or knowingly allowed child to remain in condition or surrounding that endangered her emotional and physical well-being); *In re M.F.*, 173 S.W.3d 220, 224–25

17

(Tex. App.—Dallas 2005, no pet.) (determining the evidence was sufficient to support finding mother allowed child to remain in conditions or surroundings which endangered him where home was "cluttered and full of trash"); *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.) ("[A] child's exposure to continually unsanitary living conditions . . . may prove endangerment.").

### 4. Summary

Although Mother asserts on appeal that at the time of removal the children were not harmed and appeared healthy, the children need not suffer an injury or harm because of the conditions or surroundings to which they are exposed in order for evidence to be sufficient to support a finding that the parent knowingly placed, or allowed the children to remain, in conditions that endangered their physical and emotional well-being. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re P.E.W.*, 105 S.W.3d at 777.

Viewing the evidence in the light most favorable to the trial court's findings, we conclude that the trial court could have formed a firm belief or conviction that Mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D). And, viewing the evidence in a neutral light, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being. *See id.*

We overrule Mother's first issue.[4]

## B.    Termination under § 161.001(b)(1)(E)—Endangering Course of Conduct

By her second issue, Mother argues the evidence was legally and factually insufficient to support a finding that she engaged in a course of conduct that endangered the children.

Subsection (E) allows for termination of parental rights if clear and convincing evidence supports a conclusion that the parent "engaged in conduct . . . which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). As noted, "endanger" means "to expose to loss or injury [or] to jeopardize." *Boyd*, 727 S.W.2d at 533. The term means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but "it is not necessary that the conduct be directed at the child or that the child actually suffers

---

[4] We note that the Texas Supreme Court has made it clear that the sufficiency of the evidence supporting termination under subsections (D) or (E) must always be reviewed, regardless of whether the evidence supporting termination under another statutory ground is sufficient. *See In re L.G.*, 596 S.W.3d 778, 781 (Tex. 2020) (per curiam); *In re N.G.*, 577 S.W.3d 230, 235–26 (Tex. 2019) (per curiam). Accordingly, though we find sufficient evidence to support a finding under subsection (D), as discussed herein, we also address the sufficiency of the evidence supporting the subsection (E) finding out of an abundance of caution. *See In re L.W.*, No. 06-20-00012-CV, __ S.W.3d __, __, 2020 WL 4680284, at *8 (Tex. App.—Texarkana Aug. 13, 2020, no pet.); *In re N.N.M.*, No. 04-19-00369-CV, 2020 WL 4808704, at *5–7 (Tex. App.—San Antonio Aug. 19, 2020, no pet. h.) (mem. op.); *In re S.T.*, No. 11-19-00363-CV, 2020 WL 2610393, at *3–4 (Tex. App.—Eastland May 18, 2020, pet. denied) (mem. op.); *In re J.L.V.*, No. 09-19-00316-CV, 2020 WL 1161098, at *10 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.); *In re D.C.*, No. 05-19-01217-CV, 2020 WL 1042692, at *10 (Tex. App.—Dallas Mar. 4, 2020, pet. denied); *In re M.B.*, No. 13-19-00411-CV, 2019 WL 5997509, at *6 (Tex. App.—Corpus Christi–Edinburg Nov. 14, 2019, no pet.) (mem. op.); *but see C.W. v. Tex. Dep't of Family & Protective Servs.*, No. 03-19-00654-CV, 2020 WL 828673, at *2 (Tex. App.—Austin Feb. 20, 2020, no pet.) (mem. op.) ("However, we need not review Father's challenge under Subsection (D) because the potential collateral consequences are triggered separately by the Subsection (E) portion of the trial court's judgment, which he does not challenge."); *In re K.M.*, No. 01-19-00285-CV, 2019 WL 3949483, at *8 (Tex. App.—Houston [1st Dist.] Aug. 22, 2019, pet. denied) (mem. op.) ("Because we have determined that sufficient evidence supports termination under [(E), a] predicate that could underlie a future subsection (M) termination, we see no basis for addressing Father's first issue, in which he contends the evidence is legally and factually insufficient to support the trial court's finding under subsection (D).").

19

injury." *Id.*; *see In re J.O.A.*, 283 S.W.3d at 345. "Indeed, the law does not require that the child be a victim of abusive conduct before the Department can involuntarily terminate a parent's right to the child." *In re C.J.F.*, 134 S.W.3d 343, 352 (Tex. App.—Amarillo 2003, pet. denied) (citing *Dallas Cty. Child Protective Servs. v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no pet.)). Unlike subsection (D), termination under (E) must be based on more than a single act or omission. *See Ruiz v. Tex. Dep't of Family & Protective Servs.*, 212 S.W.3d 804, 818 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

In determining whether a parent engaged in a course of "endangering" conduct, a trial court may consider conduct that occurred before and after the child's birth, in the child's presence and outside the child's presence, and before and after removal by the Department. *In re C.V.L.*, 591 S.W.3d 734, 750 (Tex. App.—Dallas 2019, pet. denied); *see In re J.O.A.*, 283 S.W.3d at 345. The relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being. *Walker v. Tex. Dep't of Family & Protective Services*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Ground (E) refers only to the parent's conduct, as evidenced by the parent's acts and by the parent's omissions or failure to act. *In re C.V.L.*, 591 S.W.3d at 750. Among the types of actions or omissions constituting evidence meeting this endangerment standard are criminal activity, convictions, and incarceration; drug abuse; and domestic violence and propensity for violence. *See In re M.D.M.*, 579 S.W.3d 744, 765 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *In re L.M.*, 572 S.W.3d 823, 834 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *In re R.A.G.*, 545 S.W.3d 645, 652 (Tex. App.—El Paso 2017, no pet.).

20

The evidence showed that Mother has been suffering from drug abuse issues throughout S.V.'s entire life, over twelve years. L.A. testified that her sister struggled with drug addiction before S.V. was born, and that drugs caused Mother to be an "entirely different person." Additionally, during the pendency of this case, the trial court informed the parties that Mother had an outstanding arrest warrant, indicating Mother was engaged in criminal activity during the pendency of the case. Furthermore, as previously mentioned, Mother's domestic violence issues, which went largely unaddressed by Mother, constitute evidence that Mother engaged in a course of conduct that endangered the children. *See In re J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

At the time of the final termination trial, Mother had checked herself into an inpatient rehabilitation facility. While the recent improvements made by Mother are positive, evidence of improved conduct, especially of short duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices. Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we conclude that there was some evidence of endangerment on which a reasonable factfinder could have formed a firm belief or conviction of endangerment. TEX. FAM. CODE ANN. § 161.001(1)(E); *In re J.O.A.*, 283 S.W.3d at 346.

We overrule Mother's second issue.[5]

---

[5] We need not address Mother's third and fourth issues challenging the sufficiency of the evidence under subsections (N) and (O) because only one ground is needed to support the termination of parental rights, and we have reviewed the sufficiency of the evidence underlying the grounds for termination under both subsections (D) and (E). *See In re N.G.*, 577 S.W.3d at 232.

**C.      Best Interests of the Children**

By her final issue, Mother contends that it was not in the best interest of the children for her rights to be terminated.

**A.      Standard of Review & Applicable Law**

Under Texas law, the parent-child relationship may be terminated upon a finding supported by clear and convincing evidence that the parent engaged in certain conduct specified in § 161.001 and termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(1),(2); *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Boyd*, 727 S.W.2d at 533. A best-interest analysis may be based on direct evidence, circumstantial evidence, subjective factors, and the totality of evidence*. In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.).

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant its judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent-child relationship would be in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(2); *In re C.H.*, 89 S.W.3d at 26. The evidence is factually insufficient if the disputed evidence that a reasonable factfinder would not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction in the truth of its finding. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

22

A determination of best interest necessitates a focus on the child, not the parent. *See In re R.F.*, 115 S.W.3d 804, 812 (Tex. App.—Dallas 2003, no pet.). There is a strong presumption that keeping a child with a parent is in the child's best interest. TEX. FAM. CODE ANN. § 153.131(b); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). The factfinder may consider a number of factors in determining the best interest of the child, including the following: the desires of the child, the present and future physical and emotional needs of the child, the present and future emotional and physical danger to the child, the parental abilities of the person seeking custody, programs available to assist those persons in promoting the best interest of the child, plans for the child by those individuals or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and there is no requirement that the Department prove all factors as a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. In some cases, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *Id*.

Because of the importance of parental rights, and the severity and permanency of termination, the quantum of proof required in a termination proceeding is elevated from a preponderance of the evidence to clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 475, 747 (1982); *accord Holick*, 685 S.W.2d at 20–21; *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003); *In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.). "Clear and convincing evidence" means the measure or

degree of proof that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see In re J.F.C.*, 96 S.W.3d at 263.

## B.     Analysis

With regard to the desires of the children, while both children expressed their love for Mother and wanted to visit continue to with her, S.V., twelve years old at the time of trial, consistently stated to her caretakers, the attorney ad litem, and the Department that she wished to stay with K.A. and L.A. She did note that if it were allowed, she would still like to visit with Mother but was happy and doing well in her current placement. According to the Department, there were times when J.K.N. expressed his desire to be with J.N., though as he was only six years old at the time of trial, there was no direct testimony as to his desire regarding termination of Mother's rights. This factor weighs in favor of the best interest finding.

The next two factors are the children's emotional and physical needs now and in the future and the emotional and physical danger to the children now and in the future. As determined in our review of Mother's first two issues on appeal, the evidence at trial established that Mother engaged in conduct which endangered the physical and emotional well-being of the children. A parent's criminal conduct and drug use may support a finding that termination is in the best interest of the child. *See In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.) (stating that a factfinder can give "great weight" to the "significant factor" of drug-related conduct); *see also In re B.G.*, No. 14-14-00729-CV, 2015 WL 393044, at *7 (Tex. App.—Houston [14th Dist.] Jan. 29, 2015,

no pet.) (mem. op.) (considering a parent's criminal and drug histories in affirming the decision that termination was in the best interest of a child). Based on Mother's positive hair follicle test confirming use of methamphetamine, inconsistent drug testing for the Department, and history of domestic violence with her romantic partners, the second and third factors weigh heavily in support of the best interest finding.

The fourth factor evaluates the parenting abilities of the individuals seeking custody. *Holley*, 544 S.W.3d at 371–72. The sixth and seventh factors examine the plans for the child by those individuals or the agency seeking custody, and the stability of the home or proposed placement. *Id*. The proposed placement and the stability of the home environment is also an important consideration in determining whether termination of parental rights is in a child's best interest. *See In re E.R.W.*, 528 S.W.3d at 267. During the pendency of the case, Mother failed to maintain stable or suitable housing for any period of time, and at the time of trial, she was in inpatient rehabilitation. While Mother informed the trial court that she was employed, she did not provide any proof of employment to the Department and did not make any child support payments. Texas courts recognize as a paramount consideration in the best-interest determination the children's need for permanence through the establishment of a "stable, permanent home." *Id*. (citing *In re K.C.*, 219 S.W.3d at 931). The record reflects that at the time of the termination trial, Mother was unable to care for the children.

In stark contrast, the Department testified that the children were both doing well in their respective placements, S.V. with her aunt and uncle and J.K.N. with his father. While there was some trouble with J.K.N.'s behavior immediately after removal, his situation

had improved before he went to live with J.N. The Department also reported that he was doing well in his placement with J.N. S.V. was thriving with her placement with K.A. and L.A., and both caretakers testified that they were ready, willing, and able to adopt S.V. The fact finder may compare the parent's and the Department's plans for the children and determine whether the plans and expectations of each party are realistic or weak and ill-defined. *In re A.R.O.*, 556 S.W.3d 903, 913 (Tex. App.—El Paso 2018, no pet.). These factors weigh in support of the best interest finding.

The fifth factor looks at the programs available to assist those individuals to promote the children's best interest. *Holley*, 544 S.W.3d at 371–72. The Department created, and the trial court adopted, a family service plan for Mother which contained various programs. Mother did not substantially comply with any task on her family service plan. Though Mother testified that she was attending counseling and alcohol and substance abuse courses, the Department caseworker did not receive any notice or proof of Mother's attendance at these programs, and therefore found Mother to be non-compliant with the family service plan. This factor weighs in favor to the best interest finding.

The eighth factor is the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one. *Id*. The evidence established that Mother endangered her children by failing to provide a safe and stable home for them, using drugs, and engaging in domestic violence. Based on this evidence, this factor weighs in favor of the trial court's best interest finding.

26

The ninth factor is whether there is any excuse for Mother's acts or omissions. *Id*. Mother does not specifically address this factor, except to generally state that the Covid-19 pandemic may have impacted Mother's ability to complete her services. This factor supports the best interest finding.

Having reviewed all the *Holley* factors, we conclude that the evidence is factually sufficient to establish a firm conviction in the mind of the trial court that termination of Mother's parental rights is in the children's best interest.

Mother's fifth issue is overruled.

### III.    CONCLUSION

The judgment of the trial court is affirmed.

NORA L. LONGORIA
Justice

Delivered and filed on the
21st day of January, 2021.