**Affirmed and Opinion Filed April 26, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-00959-CV**

**IN THE INTEREST OF D.B.S., B.L.S., B.L.P., D.E.S., AND A.B.P.,
CHILDREN**

**On Appeal from the 196th Judicial District Court**
**Hunt County, Texas**
**Trial Court Cause No. 85179**

# MEMORANDUM OPINION

Before Justices Myers, Nowell, and Goldstein
Opinion by Justice Nowell

Following a bench trial, the trial court terminated Mother's parental rights to five of her children. The children and Mother appeal and argue Mother's due process rights were violated when portions of the bench trial were conducted by remote video conference and the evidence is insufficient to support the termination findings. We conclude the constitutional claims were not preserved in the trial court and the evidence is legally and factually sufficient to support the trial court's order terminating Mother's parental rights. We affirm the trial court's order.

## Background

The trial court terminated Mother's parental rights to five of her children. At the time of trial, Dillon was thirteen, Betty was ten, Ben III was nine, Doug was four, and Angie was three.[1] Ben is the father of Dillon, Betty, Ben III, and Angie. The alleged father of Doug is C.M.[2]

Mother and Ben were never married. They began living together shortly after their oldest child, Dillon, was born in December 2006. They continued to live together until Ben was incarcerated for manufacturing and selling crack cocaine in 2013. Ben was released on parole in August 2016. After his release, he did not return to living with Mother, but would spend the night with her and the children "maybe twice a month." He explained that after he was released from prison, their relationship "wasn't the best." There were trust issues and they had a "lot of problems within the relationships."

The Texas Department of Family and Protective Services (Department) removed Dillon from the home around the time he was born because Ben "laid hands" on Mother. Dillon was returned after a temporary placement with Ben's mother. Ben admitted he and Mother had arguments but claimed "it's never been

---

[1] We use pseudonyms or initials to refer to the individuals involved in this case. TEX. R. APP. P. 9.8. Mother has another child, Missy, who was born in October 2018. Missy was removed by the Texas Department of Family and Protective Services in Hopkins County. Mother's rights to Missy are not at issue in this case.

[2] The court also terminated the parental rights of the fathers of the children, but the fathers do not appeal.

overboard or anything like that." He also admitted that law enforcement was called "plenty of times," but maintained there was no domestic violence and no charges were filed. He claimed that he never struck Mother, but conceded he "laid hands" on her three or four times in an eight-to-nine-year time period.

The Department received a referral for neglectful supervision and physical neglect of the children on April 17, 2017. The incident involved an altercation between Mother[3] and Ben. The argument began inside the home, but was moved outdoors. Mother testified that Ben hit her with a closed fist, and she hit him back. She was then "body-slammed on the ground, drug across the concrete, choked from behind" and fell unconscious. Mother remembered yelling for help and falling unconscious. She saw Dillon, aged ten at the time, by Ben when her eyesight returned.

The altercation moved back inside, at which point Mother testified Dillon went to a closet and grabbed a handgun. Mother claimed she did not know the gun was there, and she believed Dillon must have seen Ben place the gun in the closet. Dillon tossed the gun to Mother and she "tried to put the gun right in my hand and point it towards [Ben]." Ben then grabbed her arm, and they began to "tussle a little bit more." Ben "threw [her] into the TV, then towards the bed." Dillon was in the room during these events and was crying.

---

[3] Mother was six months pregnant with Missy at the time of the altercation.

Mother's niece, Dawn, who was staying in the home, testified she saw Ben "slamming [Mother] into the TV and the TV falling over." She remembered "him throwing her on the bed." Dillon jumped in and tried to stop the fight. Dillon was hitting Ben on the back and telling him to stop. She remembered the other children were in the front room with their aunt and they were "screaming and hollering for their mom." Dawn saw Ben holding Mother down on the bed "trying to put his hand on her, kind of like choke her." She saw Dillon go to the closet, looking for something. Then he grabbed a gun off the top shelf. Ben stood up and tried to get the gun from Dillon, but Dillon stepped back and gave it to Mother. Ben then went outside followed by Mother. She pointed the gun at him and told him to leave.

Ben's testimony differed greatly. Ben acknowledged that he and Mother argued. He claimed that he tried to leave, but Mother cut his tires. He called Mother's brother to pick him up, but he returned to get his clothes out of the trunk of his car. Upon his return, Mother came out of the apartment with a knife and swung it at him. He blocked it with his bag, then got in the car with her brother and left. He remembered seeing Dillon at the door when she came out and may have seen Betty. He denied seeing a gun that night and testified they never had a gun in the home.

After this incident, the Department monitored the situation and instructed Mother to take several actions, including keeping the children away from Ben. Mother gave birth to Missy in July 2017, and Ben was at the birth. On September 8, 2017, the Department filed the petition for termination of Mother and Ben's parental

rights and removed the children. The children were eventually placed with their paternal grandparents.

This case was tried to the court beginning on April 17, 2019. The trial involved twelve separate hearings over several months, ending on September 14, 2020. The last five hearings were conducted by remote video conference using the Zoom Communications, Inc. application due to the COVID-19 pandemic and pursuant to the Texas Supreme Court's emergency orders.[4]

During the case, Mother participated in and completed some, but not all of the ordered services. She did not progress in counseling nor complete all required sessions. She was consistently late for visitations with the children, many of which were canceled as a result. She failed to maintain a stable home, changing residences several times.

---

[4] The Governor declared a state of disaster in all 254 counties in the State of Texas in response to the imminent threat of the COVID-19 pandemic on March 13, 2020. The Texas Supreme Court issued several emergency orders regarding the conduct of court proceedings during the emergency. The twenty-second emergency order was in effect at the time of the last five trial hearings. It provides in part:

> 3. Subject only to constitutional limitations, all courts in Texas may in any case, civil or criminal—and must to avoid risk to court staff, parties, attorneys, jurors, and the public— without a participant's consent:
>
> . . .
>
> c. allow or require anyone involved in any hearing, deposition, or other proceeding of any kind—including but not limited to a party, attorney, witness, court reporter, grand juror, or petit juror—to participate remotely, such as by teleconferencing, videoconferencing, or other means;
>
> d. consider as evidence sworn statements made out of court or sworn testimony given remotely, out of court, such as by teleconferencing, videoconferencing, or other means;

*Twenty-Second Emergency Order Regarding COVID-19 State of Disaster*, 609 S.W.3d 129 (Tex. 2020).

Mother tested positive for drugs and missed other drug tests. She engaged in criminal activity including violating a protective order placed against her by Ben's girlfriend. She was arrested for theft, though the case was later dismissed, and she continued to drive with a suspended driver's license, resulting in several tickets and at least one arrest.

The trial court ordered termination of Mother's parental rights to each child under Texas Family Code 161.001(b)(1)(D), (E), and (O) and in the children's best interest and appointed the Department as permanent managing conservator for all the children. This appeal followed.

## Standard of Review

A court may order termination of a parent–child relationship if the court finds by clear and convincing evidence that the parent committed one or more acts or omissions enumerated in section 161.001(b)(1) and that termination is in the child's best interest. *See* TEX. FAM. CODE § 161.001(b)(1), (2).

Because the fundamental liberty interest of parents in the care, custody, and control of their children is of constitutional dimensions, involuntary parental terminations must be strictly scrutinized. *Troxel v. Granville*, 530 U.S. 57, 65–66, (2000); *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In such cases, due process requires the petitioner to justify termination by clear and convincing evidence. FAM. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). "Clear and convincing evidence" is that "measure or degree of proof that will produce in the mind of the

trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." FAM. § 101.007; *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam); *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.).

Our standard of review reflects the elevated burden at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas 2013, pet. denied). Under both legal and factual sufficiency standards, we consider all the evidence, defer to the factfinder's credibility determinations, and determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002); *In re N.T.*, 474 S.W.3d at 475. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018).

In conducting a legal-sufficiency review of an order terminating parental rights, the reviewing court cannot ignore undisputed evidence contrary to the finding but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *Id.* We "consider all the evidence, not just that which favors the verdict," and we assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re N.T.*, 474 S.W.3d at 475. We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

When reviewing the factual sufficiency of the evidence supporting a termination finding, we ask whether, in light of the entire record, the evidence is such that a factfinder could reasonably form a firm conviction about the truth of the allegations against the parent. *Id.*; *In re J.D.B.*, 435 S.W.3d 452, 463 (Tex. App.—Dallas 2014, no pet.). We must consider whether the disputed evidence is such that a reasonable factfinder could not have reconciled that disputed evidence in favor of its finding. *In re N.T.*, 474 S.W.3d at 475. If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

The supreme court has identified a nonexclusive list of factors that may be relevant to a best-interest determination: (1) the child's desires, (2) the child's current and future emotional and physical needs, (3) current and future emotional and physical dangers to the child, (4) the parental abilities of those seeking custody, (5) the programs available to help those individuals promote the child's best interest, (6) those individuals' plans for the child, (7) the home's or proposed placement's stability, (8) the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The *Holley* factors focus on the best interest of the child, not the best interest of the parent, and are not exhaustive. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ); *see In re*

*C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). A best interest finding need not be supported by evidence of every *Holley* factor. *See In re C.H.*, 89 S.W.3d at 27. Further, the same evidence can be relevant to both section 161.001(b)(1) termination grounds and the child's best interest. *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied). Although there is a strong presumption that maintaining the parent–child relationship serves the child's best interest, there is also a presumption that promptly and permanently placing the child in a safe environment is in the child's best interest. *Id.*; *see also* TEX. FAM. CODE § 153.131(b).

When, as in this case, a trial court terminates a parent's rights based on section 161.001(b)(1)(D) or (E) and the parent challenges that finding on appeal, due process requires the appellate court to review the finding and detail its analysis even if it affirms the termination order based on other grounds under section 161.001(b)(1). *In re C.W.*, 586 S.W.3d 405, 406 (Tex. 2019) (per curiam); *In re N.G.*, 577 S.W.3d at 235.

## Analysis

### A. Preservation of Constitutional Claim

In her first issue, Mother argues she was denied due process when part of the trial was conducted by video conference with frequently malfunctioning video equipment. The primary argument in her brief, however, is that she was denied the right of confrontation because of the video conference. U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with

the witnesses against him."); Tex. Const. art. 1, § 10 ("In all criminal prosecutions the accused . . . shall be confronted by the witnesses against him.").

This Court observed that some courts have refused to consider confrontation clause challenges in suits affecting the parent-child relationship because the proceedings are civil, not criminal. *In re S.P.*, 168 S.W.3d 197, 206–07 (Tex. App.—Dallas 2005, no pet.) Other courts have recognized that the right of cross-examination is normally part of the meaningful hearing requirement of due process. *Id*. While the Court did not reach the constitutional issue, we noted that preservation of error requirements apply in termination cases. *Id.*, *citing In re M.S.*, 115 S.W.3d 534, 547–49 (Tex. 2003) (rule governing preservation of factual sufficiency complaint satisfies due process and counsel's unjustified failure to preserve error may be ineffective assistance of counsel); *In re B.L.D.*, 113 S.W.3d 340, 351–54 (Tex. 2003) (requiring preservation of error in parental termination case satisfies due process); *In re J.F.C.*, 96 S.W.3d 256, 272–74 (Tex. 2002) (using deemed findings to support judgment in parental termination case satisfies due process). Again, we do not reach the question of whether the Confrontation Clause applies to involuntary termination cases because we conclude Mother and the Children did not preserve this complaint in the trial court.[5]

---

[5] In their second issue, the Children raise the same complaint as Mother. However, counsel for the Children did not make any objection in the trial court to proceeding by video conference. Thus, their complaint is not preserved. TEX. R. APP. P. 33.1(a).

The trial resumed on August 18, 2020, by two-way videoconferencing. Mother was cross-examined by the Department. At the beginning of the hearing, Mother's audio was muted, which was quickly corrected, and she answered the question asked of her. Questioning continued and after a discussion of proper impeachment using the transcript of a prior hearing, the following discussion occurred:

> [MOTHER'S ATTORNEY:] I'm objecting to this continuation by zoom. This, I believe, because it's a termination of parental rights, is right up there with an essential needs kind of case. These kind of issues, because of the voluminous amount of evidence that's already been heard by the Court and Exhibits that have been admitted by the Court, trying to go back and forth now at this particular method in this particular format, I do not believe is giving to my client her guaranteed – her constitutional right to protection in the termination of — of these — these children.

> THE COURT: All right. Well, that – that objection is overruled. We're going to continue. The essential needs requirement — yeah — just to make note though, the essential needs requirement means that I am allowed to have an in-person hearing, not that I must have an in-person hearing for those essential needs hearings; and the Court has — the Court of Criminal Appeals and the court of — the Supreme Court have both given me the full authority to proceed with zoom in any proceeding.

> And so, again, I note the objection. I certainly understand it and I'll note even, if it's necessary to do so — I don't think it is but I will note that every other evidentiary hearing during this trial has been held live and in-person so I do take note of that. But I do understand the objection.

In order to present a complaint for appellate review, the record must show that the complaint was presented to the trial court in a timely request, motion, or objection that stated the specific grounds for the ruling and was ruled on by the trial court. TEX. R. APP. P. 33.1(a). Constitutional claims must be raised below or they are not preserved for appellate review. *In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003) (holding that father whose parental rights were terminated waived due process

–11–

argument regarding inability to read his affidavit of relinquishment because he did not raise issue in trial court); *Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (holding alleged biological father waived constitutional error even though he did not have notice of hearing in prior paternity proceeding).

The rules governing error preservation apply to civil cases involving termination of parental rights. *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005). "Appellate review of potentially reversible error never presented to a trial court would undermine the Legislature's dual intent to ensure finality in these cases and expedite their resolution." *In re B.L.D.*, 113 S.W.3d at 353 (requiring preservation of error in parental termination case satisfies due process); *In re Baby Boy R.*, 191 S.W.3d 916, 921 (Tex. App.—Dallas 2006, pet. denied) (holding that father waived confrontation claims by failing to raise issue in parental termination proceeding).

Here, Mother objected to continuing the trial by videoconference, but the objection was late and not specific. Mother's general reference to "constitutional protections" was too vague and indefinite to preserve a Confrontation Clause complaint for appeal. *See Dupuy v. State*, __ S.W.3d __, __, No. 14-19-00119-CR, 2020 WL 1942410, at *7 (Tex. App.—Houston [14th Dist.] Apr. 23, 2020, pet. ref'd) (appellant's bare objection on basis of "constitutionality" was not sufficiently specific to preserve complaint under Confrontation Clause); *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) (hearsay objection does not preserve

–12–

confrontation complaint); *Daniels v. State*, 25 S.W.3d 893, 897 (Tex. App.— Houston [14th Dist.] 2000, no pet.) (holding error not preserved by non-specific objection that evidence did not satisfy "the requirements of the Constitution and the Code of Criminal Procedure"). Although the trial court indicated an understanding that Mother would prefer an in-person hearing, the objection did not apprise the court of the complaint made on appeal that the Confrontation Clause *required* an in-person hearing.

We conclude the constitutional issues raised on appeal were not preserved in the trial court. We overrule Mother's first issue and the Children's second issue.[6]

## B. Sufficiency of the Evidence

Mother in her second issue and the Children in their first issue argue that the evidence is legally and factually insufficient to support the predicate findings and best interest determination supporting termination of Mother's parental rights.

### 1. Grounds for Termination

The trial court found by clear and convincing evidence that Mother's parental rights should be terminated under subsections (D), (E), and (O) of Family Code section 161.001(b)(1). TEX. FAM. CODE § 161.001(b)(1)(D), (E), and (O). Parental rights may be terminated where the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the

---

[6] The Department argues the Children do not have standing to raise this issue. Assuming without deciding that the Children have standing, the Children's second issue would be resolved in the same manner as Mother's first issue.

physical or emotional well-being of the child"; the parent has "engaged in conduct . . . which endangers the physical or emotional well-being of the child"; or the parent failed to comply with a court order establishing actions necessary for the parent to obtain return of the child. *Id.* "Endanger" means to expose to loss or injury, to jeopardize; it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *In re C.E.K.*, 214 S.W.3d 492, 497 (Tex. App.—Dallas 2006, no pet.). Inconsistent participation in visitation with the children can endanger the children's emotional well-being. *In re A.R.O.*, 556 S.W.3d 903, 911 (Tex. App.—El Paso 2018, no pet.). A parent's drug use supports a conclusion the parent is endangering the children's well-being. *In re S.R.*, 452 S.W.3d 351, 361–62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re J.T.G.*, 112 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child. *In re S.R.*, 452 S.W.3d at 360–61.

As described above, there is evidence of a history of family violence and emotional conflict between Mother and Ben. The children were exposed to frequent arguments and law enforcement was called several times. Ben admitted he "laid hands" on Mother shortly after their oldest child was born and three or four times

afterwards over an eight-to-nine-year period. Further, there was evidence of the violent April 17, 2017 altercation, Dillon's access to an unsecured firearm, and Mother's purported attempt to use it on Ben.

The trial court heard evidence that Mother had an altercation with Ben's girlfriend in violation of a protective order and was arrested and jailed as a result. She was also arrested for theft, though the case was later dismissed. There was evidence Mother tested positive for drugs and missed four drug tests. The trial court ordered visitations suspended in July 2018 until Mother had two negative urinalysis tests at least two weeks apart. From this, the trial court could reasonably infer that Mother avoided taking drug tests because she was using drugs. *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.)

In addition, there was evidence of uncertainty and instability in the children's lives. *See In re A.R.O.*, 556 S.W.3d at 910–11 (subjecting child to life of uncertainty and instability endangers physical and emotional well-being of child). Before they were removed, Dillon was in the fifth grade, Betty was in second grade, and Ben III was in first grade. Mother testified that Dillon and Betty had been in four different schools and Ben III had been in two. After the Department became involved in May 2017, Mother moved frequently, eight times over two years. One of the requirements of Mother's service plan was to maintain a stable residence. She agreed that moving eight times over two years was not a stable residence.

Mother showed instability by continuing to drive with a driver's license that had been suspended for years. She was ticketed more than three times for driving with a suspended license and jailed twice for failing to pay her tickets. She was jailed in August 2019 on a warrant for failing to appear in Rockwall County relating to a ticket for driving with a suspended license.

The trial court also heard evidence that Mother neglected the children's dental health. She confirmed the three oldest children had baby teeth removed due to decay. Charlene Green, Mother's caseworker, testified Dillon had several cavities filled. Ben III had five or six cavities, but not as many as Dillon. Betty also had cavities filled and a spacer placed for a tooth that was pulled. Green testified that Doug's four front teeth were badly decayed and two were pulled immediately. Eventually, all four teeth were pulled.

Mother was consistently late to visitations with the children. In January 2017, the court ordered her to arrive at least fifteen minutes early, or the visits would be canceled. In January 2018, the court ordered that she arrive and sign-in at least thirty minutes before the scheduled visitation. The court also ordered that if she was late for one visitation, the Department should not schedule another until further order of the court. Newell, her first caseworker, testified that three of Mother's visits were canceled because she was late and did not follow the court's orders. He testified Mother missed the very first parent-child visit because she had been arrested the

night before. He also testified that she sometimes showed up on time but could not be consistent.

Newell explained it is important for parents to be on time for visits because the children are there and expecting to visit at a certain time. They are disappointed when a visit does not happen. Being on time also shows the parent can be responsible with the children once the Department is no longer involved. Mother admitted she has not seen the children since February 2020 due to being late for visits.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we conclude there was some evidence of endangerment on which a reasonable factfinder could form a firm belief or conviction of endangerment. FAM. § 161.001(b)(1)(D), (E); *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009); *In re J.F.C.*, 96 S.W.3d at 266. We also conclude, after considering the entire record, including the disputed evidence, that the factfinder could have resolved the disputed evidence in favor of its finding and reasonably could have formed a firm belief or conviction of endangerment. *In re N.T.*, 474 S.W.3d at 475. Because the evidence is legally and factually sufficient to support the endangerment findings, we need not address the finding on subsection (O).

## 2. Best Interest of the Children

The trial court found by clear and convincing evidence that termination was in the best interest of the children. Evidence supporting termination under one of the

grounds listed in section 161.001(1) also can be considered in support of a finding that termination is in the best interest of the children. *See In re S.R.*, 452 S.W.3d at 366–67; *In re C.H.*, 89 S.W.3d at 27 (holding the same evidence may be probative of both section 161.001(1) grounds and best interest). We consider several nonexclusive factors in evaluating the sufficiency of the evidence to support a best interest finding. *See Holley*, 544 S.W.2d at 371–72. A best interest finding need not be supported by evidence of every *Holley* factor. *See In re C.H.*, 89 S.W.3d at 27.

### a. Desires of the Children

The three oldest children expressed a desire to be with Mother and were closely bonded with her. The two youngest could not express their desires but the trial court could consider whether the children bonded with their foster family, were well cared for by the foster family, and the amount of time spent with a parent. *In re S.R.*, 452 S.W.3d at 369. The youngest children were placed with their siblings in their paternal grandparents' home. Green, the current caseworker, testified they were doing well, and their ad litem agreed they are thrilled to be with their siblings. Green testified about the stability of the grandparents' home, which is in an established neighborhood, with plenty of room for activities and play, and that the children have made friends with other children in neighborhood. She testified the children have benefitted from the placement with their grandparents and are in a safe, stable environment with caregivers that have their best interests at heart. The trial court could reasonably conclude that the younger children desire to be with their

grandparents. *Id.* While a child's love for her natural parents is an important consideration in determining the best interest of the child, it cannot override overwhelming evidence of endangerment. *In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.). Considering the endangerment evidence discussed above, the trial court could reasonably have weighed this factor as neutral or favoring termination.

### b. Emotional and Physical Needs and Dangers

Regarding the children's current and future physical and emotional needs and dangers, Mother argues she never committed an act or omission that would support a finding of abuse or neglect. However, as detailed above, there was evidence that Mother exposed the children to family violence, drug use, criminal activity, uncertainty, and instability. Mother and Ben's relationship was plagued by confrontation and disagreement. Many of the arguments were conducted in the presence of the children. There is evidence of neglect of the children's dental health and disruption of their education by frequent changes in schools. Mother's inability to find stable housing, address issues with her driver's license, or consistently arrive on time for visitations with the children, is evidence she cannot meet the children's physical and emotional needs. Further, the trial court could not overlook the dangers of Mother's drug use and continued criminal activity.

### c. Parenting Abilities and Available Programs

Mother's failure to complete the services required in her service plan for reunification also supports the trial court's best-interest determination. *See In re S.R.*,

452 S.W.3d at 367. There was conflicting evidence of whether Mother completed some of the services required in her service plan. Mother testified she completed a substance abuse evaluation and followed all the recommendations. She claimed she completed individual drug counselling and attended NA/AA meetings until October 2020 when she was told she was no longer required to attend NA/AA. Her caseworkers, however, testified they had not received NA/AA sign-in sheets from Mother since April 2018. Further, Mother admitted she did not complete co-parenting classes, she was discharged from counseling, and she continued to engage in criminal activity. The trial court could have reasonably resolved these conflicts in favor of its best interest finding.

The evidence supports the conclusion that Mother lacks parenting skills and is unable or unwilling to engage in services and programs designed to assist her in improving those skills. Her conduct in this case, as well as the history of discord, violence, and neglect is evidence supporting termination of the parent-child relationship.

### d. Plans for Children and Stability of Current Placement

The children's current placement further supports the trial court's finding that termination is in the best interest of the children. All of the children are currently placed together with their paternal grandparents and enjoy being with their siblings. Green testified the grandparents' home is stable and the children have made friends with other children in neighborhood. Green testified that Dillon struggled in school

at first due to moving schools several times during his elementary education. After placement with his grandparents, he was successfully discharged from counseling and is now "doing well" in school. Betty excels in school. While Ben III struggled with the transition from first to second grade while in foster care, he has recovered and is "doing well." Green testified the other children are "doing really well." The children have benefitted from the placement with their grandparents; they are in a safe and stable environment. The Department's goal is for the paternal grandparents to adopt the children.

e. Acts and Omissions Showing Relationship is not Proper

As detailed in our discussion of the grounds for termination, there was evidence that Mother's acts and omissions show the existing parent-child relationship is not a proper one. While there was also conflicting evidence, a reasonable factfinder could have resolved those conflicts in favor of the trial court's finding. Evidence of Mother's instability, noncompliance with services, patterns of domestic violence, drug use, other criminal behavior, neglect of the children's dental care, and the children's inconsistent schooling support this factor.

f. Parent's Excuses

Mother blames the Department for her failures to complete services and her discharge from counseling. She also points to her niece's testimony that she was a great mom, but after the children were removed Mother "kind of fell off and was a little depressed." However, Mother agreed she was responsible for being late for

visitations, not completing co-parenting classes, being arrested for theft, and violating the protective order.

### 3. Summary

After reviewing all the evidence in the light most favorable to the judgment, we conclude a factfinder could have reasonably formed a firm belief or conviction that termination of Mother's parental rights is in the children's best interest. Further, and in light of the entire record, we find the disputed evidence is not so significant that a factfinder could not have reasonably formed a firm belief or conviction that termination was in the children's best interest. The evidence is therefore legally and factually sufficient to support the trial court's order of termination. We overrule Mother's second and the Children's first issue.

## Conclusion

We conclude the constitutional issues raised on appeal were not preserved in the trial court and that the evidence is legally and factually sufficient to support the trial court's findings. We affirm the trial court's order of termination.

/Erin A. Nowell/
ERIN A. NOWELL
JUSTICE

200959F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF D.B.S., B.L.S., B.L.P., D.E.S., AND A.B.P., CHILDREN

No. 05-20-00959-CV

On Appeal from the 196th Judicial District Court, Hunt County, Texas Trial Court Cause No. 85179. Opinion delivered by Justice Nowell. Justices Myers and Goldstein participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 26th day of April, 2021.